Eugene Joseph THERIOT,
Plaintiff-Appellant Cross
Appellee,

v.

BAY DRILLING CORPORATION, Defendant-Third Party Plaintiff-Appellee Cross Appellant,

and

Oilfield Services of Louisiana, Inc., et al., Defendants-Appellees,

FIDELITY & CASUALTY COMPANY OF NEW YORK, Intervenor-Appellee,

v.

HOUSTON OIL & MINERALS CORPORATION, Third Party Defendant-Appellee.

No. 84–4576.

United States Court of Appeals,
Fifth Circuit.

Feb. 20, 1986.

Baggett, McCall & Rainer, William B. Baggett, Lake Charles, La., for Eugene Joseph Theriot.

Simon, Peragine, Smith & Redfearn, Daniel J. Caruso, New Orleans, La., for Bay Drilling Corp., & Texaco.

Onebane, Donohoe, Bernard, Torian, Diaz, Timothy J. McNamara, Lafayette, La., for Oilfield Services of La., Inc.

Monroe & Lemann, C. Theodore Alpaugh, III, Richmond M. Eustis, New Orleans, La., for Atlas Assurance Co. of America.

Camp, Carmouche, Barsh, Hunter, Gray & Hoffman, David Bienvenu, Nancy A. Donovan, New Orleans, La., for Fidelity & Casualty Co., of N.Y.

Liskow & Lewis, S. Gene Fendler, New Orleans, La., for Houston Oil & Minerals.

Before GOLDBERG, RANDALL and JOHNSON, Circuit Judges.

RANDALL, Circuit Judge:

Appellants Eugene Joseph Theriot and Bay Drilling Corp. appeal from the judgments of the district court denying seaman status, determining negligence, assessing damages, and denying contractual indemnity. We affirm in part, but reverse and remand on the indemnity issue.

## I. FACTS.

On January 28, 1980, Eugene Joseph Theriot ("Theriot") slipped and fell, injuring his right knee while employed in Galveston Bay on a drilling barge, the ROME, owned by Bay Drilling Corp. ("Bay Drilling"). Theriot, a torque-wrench operator, was a specialty worker employed by Oilfield Services of Louisiana, Inc. ("Oilfield Services") to "nipple up" (take off) and "nipple down" (replace) the blowout preventor and the Christmas tree on the well. Theriot had been assigned to the ROME since January 3, 1980. During the period prior to his accident, Theriot was on 24 hour call, logging 600 hours, of which only 80 hours were involved in actual nippling operations. Theriot went home to Opelousas, Louisiana, three or four times during this period, but remained "on call." On January 28, 1980, Theriot was called to assemble certain well head equipment. He and a coworker proceeded to the keyway deck where the blowout preventors were located. As Theriot crossed the deck, he encountered a large clearly visible area, approximately six to eight feet in diameter, of brown drilling mud. Continuing across the deck, Theriot slipped and fell in the mud, injuring his right knee.

Two days after the accident, Theriot saw Dr. Frederick L. Mayer. Dr. Mayer noted a limp, a mild swelling of the right knee, a bluish discoloration on the thigh, tenderness, and the inability to stoop or squat. On February 26, 1980, Dr. Lee Leonard performed an arthroscopic examination which revealed what appeared to be a fracture inside the knee. Three months later, Dr. Mayer again examined Theriot's knee; the results proved inconclusive. At that time an arthrotomy, wherein the knee joint is surgically opened, was performed. The arthrotomy revealed an inflammation of the capsule around the right knee joint. Dr. Mayer put Theriot on a course of physical therapy and exercise. By October 9, 1980, Dr. Mayer discharged Theriot to return to work, with a 10% to 15% partial permanent physical impairment of the entire right lower leg. Dr. Mayer advised discontinuance of supervised physical therapy, but instructed Theriot to continue exercising on his own.

On March 11, 1981, Theriot slipped and fell at work, twisting his ankle and leg, and reinjuring his right knee. Following this accident, Theriot was again examined by Dr. Mayer and by Dr. David Drez, Jr. After several months of problems, Theriot underwent a total patellectomy of the right knee which resulted in a 35–40% disability of the right leg, precluding Theriot from engaging in his former employment.

As a result of the January 1980 accident, Theriot brought an action against his employer, Oilfield Services, and the barge owner, Bay Drilling, for negligence and unseaworthiness of the barge. Bay Drilling filed a third party action against Houston Oil & Minerals Corporation ("Houston Oil") for indemnity under its drilling contract. Houston Oil, the operator of the oil and gas lease, had contracted for the services of both Oilfield Services and Bay Drilling. Fidelity & Casualty Company of New York ("Fidelity"), the compensation carrier of Oilfield Services at the time of the January 1980 accident, and Atlas Assured ("Atlas"), the excess liability insurer of Oilfield Services, intervened in the action. Fidelity sought to recover compensation and medical expenses paid to or on behalf of Theriot under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"). Fireman's Fund Insurance Company ("Fireman's Fund"), the compensation carrier for Oilfield Services after January 1980, intervened on the grounds that Theriot's disability was caused by the January 1980 accident and that it was entitled to benefits wrongfully paid to Theriot for the March 11, 1981, injury.

The suit was severed into three trials on the issues of seaman's status, liability and damages. At the first trial, the jury answered a special interrogatory finding that Theriot was not a "seaman and member of the crew" of the drilling barge. This finding was predicated upon jury instructions which required the jury to determine if Theriot had a "more or less permanent connection with the vessel" or performed a "substantial portion of his duties aboard a vessel." If the jury answered yes to either question, Theriot would be a seaman, the other elements of the *Robison* test [1] having previously been met. The jury thus evidently found that Theriot did not have a permanent connection with the vessel and that he did not perform a substantial portion of his duties aboard the vessel. Oil-

field Services and Atlas Assured were dismissed from the action.

In the second trial, the district court held Bay Drilling negligent in failing to clean the drilling mud off the keyway deck where Theriot worked. The court found that this negligence was not barred by Theriot's knowledge of an open and obvious danger. The court concluded that although Theriot should have known of the likelihood of mud on the deck, *Scindia Steam Navigation Co. Ltd. v. De Los Santos*, 451 U.S. 156, 167, 101 S.Ct. 1614, 1622, 68 L.Ed.2d 1 (1981), imposes liability despite the claimant's knowledge of a dangerous condition. After comparing the actions of both parties, the district court held Theriot and Bay Drilling equally at fault, reducing Theriot's total damages by one-half.

In the final trial, the court concluded that the January 1980 accident on the ROME caused a 15% disability in Theriot's right leg. The court found that the March 11, 1981, accident was not cause by Theriot's weakened knee, but occurred when Theriot slipped on a bolt. Theriot thus failed to prove that the injury which necessitated the patellectomy and resulted in a 35–40% disability of the right leg was proximately caused by the January 1980 ROME accident. The court concluded that as a result of the January 1980 ROME accident, Theriot was entitled to $23,865.58 in lost wages, $125,000.00 for past and future pain and suffering, and $15,860.32 in past medical expenses paid by intervenor Fidelity. Theriot's contributory negligence limited this recovery by 50%, providing for a judgment for Theriot against Bay Drilling in the amount of $82,362.95. The court also awarded Theriot interest at a rate of 10.10% from January 3, 1984. The court allowed Fidelity to recover from Theriot a total of $68,977.22, consisting of $53,166.90 in compensation benefits paid as of October 7, 1983, and $15,860.32 in medical expenses paid. Finally, the court denied intervenor Fireman's Fund any recovery because Theriot's increased disability was not

1. *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.1959).

caused by the January 1980 ROME accident.

In a supplemental opinion and order, the district court reasoned that the indemnity clause in the Houston Oil-Bay Drilling contract was governed by state, not maritime, law. Pursuant to Louisiana choice-of-law rules, the court found that Texas law controlled because the contract was accepted in Houston, Texas. The court then applied Tex.Rev.Civ.Stat.Ann. art. 2212b § 1 (Vernon Supp.1984) to render the indemnity clause indemnifying Bay Drilling for its own negligence void as against public policy.

## II. SEAMAN STATUS.

Theriot argues that the district court erred in denying his motion for a directed verdict on seaman status. "While it is firmly established that the question of [seaman status] is ordinarily resolved by the trier of fact, the trial court may, nonetheless, enter a directed verdict where the record demonstrates that reasonable persons could not draw conflicting inferences which might lead to another conclusion." *Landry v. Amoco Production Co.*, 595 F.2d 1070, 1072 (5th Cir.1979). Theriot asserts that the record reveals uncontradicted evidence that he was indefinitely assigned to the drilling barge ROME for the last one-third of the vessel's mission; the only possible finding was thus that Theriot was "permanently assigned" to the barge and a seaman.

■ We do not agree that the record evidence was either uncontradicted or conclusive. Theriot presented evidence that he logged 600 hours of "work" on the ROME over a twenty-five day period in January 1980. He testified that his assignment to the ROME was supposed to continue "until it was completed." Bay Drilling, however, offered evidence that Theriot's initial assignment was for a period of six days after

which Theriot had the option to take off for three days and receive an assignment to a new location. According to Bay Drilling, Theriot's assignment was not co-extensive with the ROME's mission: the ROME's mission began 53 days before Theriot boarded and continued several days after Theriot's assignment was completed. In addition, Oilfield Services offered evidence that during the six months prior to Theriot's ROME assignment, Theriot had not worked offshore. From this evidence, it can be seen that Theriot's connection with the drilling barge ROME was highly controverted by the parties. We conclude that based upon the above evidence, reasonable jurors could have drawn conflicting inferences and differing conclusions on the issue of whether Theriot was "assigned permanently" to the ROME,[2] and that the district court's denial of a directed verdict on seaman status was not improper.

■ Theriot raises two evidentiary points of error in the seaman trial. Theriot contends, first, that the district court erred in admitting evidence of Theriot's work history prior to his assignment to the ROME and, second, that the district court erred in admitting invoice and delivery tickets which revealed two marine charges over a six month period. Absent proof of abuse of the district court's discretion, we will not disturb a district court's evidentiary rulings. *Jon-T Chemicals, Inc. v. Freeport Chemical Co.*, 704 F.2d 1412, 1417 (5th Cir.1983). We find no abuse in the instant case.

■ Theriot contends that the evidence of his work history prior to his ROME assignment was both irrelevant to the issue of his permanent connection with the barge and prejudicial to the jury. This contention is meritless. The *Robison* seaman status test requires the plaintiff to have a more or less permanent connection with the vessel. This requirement can be

2. On appeal, Theriot does not argue that the evidence mandates a finding that he "performed a substantial part of his work on the vessel." Theriot argues in his brief to us that such a finding is not necessary to seaman status if the remainder of the *Robison* test is met. We therefore will not consider the issue of Theriot's performance of a "substantial part of his work on the vessel."

satisfied either by finding that the injured workman was assigned permanently to the vessel *or* by finding that the workman performed a substantial part of his work on the vessel. *Offshore Co. v. Robison,* 266 F.2d 769, 779 (5th Cir.1959). To determine whether a claimant satisfies the substantial work prong of *Robison,* it is necessary to consider all circumstances of the claimant's employment. *Bertrand v. International Mooring & Marine, Inc.,* 700 F.2d 240, 247 (5th Cir.1983). As the instant case was tried on both substantiality and permanency theories, Theriot cannot on appeal urge us to conclude that only the permanency of the assignment was the meaningful inquiry. We refuse to ignore Theriot's tactical decision to try the seaman status issue on both theories. The district court did not abuse its discretion in admitting evidence of Theriot's prior work history.

 Theriot argues that the admitted invoices and delivery tickets were hearsay and not properly qualified to be admitted under Federal Rules of Evidence, Rule 803(6). Theriot asserts that the documents were not authenticated, and that the documents were admitted prior to establishing the necessary foundation. We disagree that Oilfield Services failed to lay a proper predicate for the invoice and delivery tickets. Rule 803(6) of the Federal Rules of Evidence excepts from exclusion:

> a record ... made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the ... record ... all as shown by the testimony of the custodian or other qualified witness, unless the *source of information or method* of circumstances of preparation indicate lack of trustworthiness.

In the instant case, Ray Cutler, a vice-president of Oilfield Services, testified that Oilfield Services' employees had pulled all de-livery tickets signed by Theriot and the invoices generated by such delivery tickets from the company's business files for the period of July 27, 1979, to July 8, 1980. Wilden Paul Terrell, the former Operations Manager employed at Oilfield Services at the time Theriot worked at the company, testified that the documents were kept and generated in the ordinary course of business: the delivery tickets were prepared in the ordinary course of business by the worker who performed the services logged and the invoices were generated by Oilfield Services' office personnel in the regular course of business from the delivery tickets so prepared. This testimony of Cutler and Terrell properly authenticated the business records. "Any person in a position to attest to the authenticity of certain records is competent to lay the foundation for the admissibility of the records; he need not have been the preparer of the record, nor must he personally attest to the accuracy of the information contained in the records." *Rosenberg v. Collins,* 624 F.2d 659, 665 (5th Cir.1980). We therefore find no abuse of discretion in the trial judge's finding of proper predicate and trustworthiness of the records.[3]

 We also find that a proper foundation was laid for the admission of these documents. The delivery tickets revealing two marine charges over a six month period, contradicted Theriot's testimony on direct that he spent approximately 50% of his time offshore. Rule 613 of the Federal Rules of Evidence requires that a witness be afforded an opportunity to explain or deny extrinsic evidence of his prior inconsistent statement; Rule 613 does not, however, specifically require inspection of the statement by the witness *prior* to further questioning about the statement. *See* Fed. R.Evid. 613, Advisory Committee Note. It was therefore enough that Theriot was given an opportunity to inspect the delivery tickets and invoices on cross-examination.

---

**3.** Theriot additionally contends that the records were incomplete. This contention is unfounded. The documents were "complete" for the entire period of Theriot's employment beginning in November 1978 at Oilfield Services until the documents from November 1978 to July 1979 were excluded by Theriot's own objection of undue surprise. The documents admitted were in fact complete as to the six months preceding Theriot's first slip and fall.

Theriot next argues that the trial court erroneously defined "permanent assignment" in its initial jury charge and erroneously denied Theriot's requested supplemental charge correctly defining "permanent assignment."[4] Viewing the charge as a whole, the reviewing court "must determine not whether the charge was faultless in every particular but whether the jury was misled in any way and whether it had understanding of the issues and its duty to determine those issues." *McCullough v. Beech Aircraft Corp.*, 587 F.2d 754, 759 (5th Cir.1979) (citing *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1100 (5th Cir.1973), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974)). We find that the instruction correctly embodied the substance of the *Robison* seaman test and clearly gave the jury guidance. The jury did ask for explicit instruction[5] as to the specific amount of time that must pass before one leaves the status of being considered "in transit." The court replied

> No specific period of time aboard a vessel is required for an employee to be considered more or less permanently as-

signed to that vessel as opposed to having only a transitory connection with the vessel. The period of time depends upon all the facts and circumstances in each individual case. It is for you to decide from all the evidence whether Mr. Theriot's connection was more or less permanent on one hand or transitory on the other.

Theriot argues that the jury's question indicated its confusion about the initial charge. The court therefore should have granted Theriot's request for a supplemental instruction. We find that the charge as a whole did not mislead the jury in any way. Although it did not specifically instruct the jury that an indefinite assignment or assignment for the duration of the vessel's mission might be a factor in considering whether Theriot met the "permanent assignment" prong of the *Robison* test, the charge did convey an understanding of the issue, and did convey the jury's duty in determining the issue. We conclude that the trial court's charge did not constitute reversible error.

## III. LIABILITY.

Bay Drilling asserts that the district court erred both legally and factually in

---

**4.** The initial charge instructed the jury:

In order to be considered a seaman under the law an employee must meet three tests. First, he must show that he was doing work on or in connection with the vessel in navigation. Two, his duties must be duties that contribute to the function of the vessel. And finally, he must have a more or less permanent connection with the vessel or perform a substantial portion of his duties aboard the vessel. Ladies and gentlemen, I have concluded that no issue of fact is raised as to the first two prongs of the test. That is, I conclude that there is no issue of fact but that the plaintiff was doing work on or in connection with the vessel in navigation. So there is no issue to decide on that first prong. Likewise, on the second prong I conclude there is no issue of fact but that his duties did contribute to the function of the vessel. So the only, the only issue, the only part of that test that you must deal with is the third part of the test. That is whether Mr. Theriot had more or less permanent connection with the vessel, or whether he performed a substantial portion of his duties aboard a vessel. Now the employer need not own or operate vessels in order for

its employee to become a member of the crew of that vessel. Again, the only issue presented to you is whether Mr. Theriot was more or less permanently connected to the ROME, or whether he performed a substantial portion of his duties aboard the ROME. If your answer is yes to either part of that question, then you should, you should find that Mr. Theriot was a seaman. In order to find that the plaintiff had more or less permanent connection with the ROME, you must find that he had more than a transitory or passing connection with that vessel. Thus if Mr. Theriot's connection with the ROME was more than temporary, more than transitory, you must find that he was a member of the crew of that vessel. On the other hand, if you find Mr. Theriot was aboard the vessel temporarily to perform an isolated piece of work, you may find that he was not a seaman.

Tr. Transcript, Vol. VII, at 154–55.

**5.** We note that after receiving the judge's initial charge, the jury also requested "to see the three specific questions that were asked of [the jury] to decide on the issue." In response to that request, the judge reiterated the initial charge given to the jury in virtually the same language.

finding it negligent. Bay Drilling alleges that the district court should not have applied *Scindia Steam Navigation Co., Ltd. v. De Loss Santos*, 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981), to hold Bay Drilling negligent in the face of an open and obvious danger, because the instant case involved a condition on the vessel which existed at the *outset* of operations as opposed to a *Scindia* condition arising during the course of the worker's operations. Bay Drilling nonchalantly argues that in fact it had no duty to furnish a clean deck. This argument is clearly incorrect.

The Supreme Court in *Scindia* outlined the general duties of a shipowner to a contracting stevedore and its longshoremen. The Court explained that at the outset, prior to the beginning of the worker's operations, the shipowner has a duty to exercise "ordinary care under the circumstances to have the ship and the equipment in such condition that an expert and experienced stevedore will be able, by the exercise of reasonable care, to carry on its operations with reasonable safety." *Id.* at 167, 101 S.Ct. at 1622. The shipowner also has a duty to warn the stevedore of hidden dangers at the outset. *Id.* Once the stevedoring operations begin, however, the shipowner has no general duty to supervise or intervene to discover and repair dangerous conditions which develop within the confines of the operations that are assigned to the stevedore, unless the shipowner has actual knowledge that the dangerous condition exists and that the stevedore or its longshoremen would exercise improvident judgment by continuing to work despite the dangerous condition. *Id.* at 167–68, 175–76, 101 S.Ct. at 1622–23, 1626–27. We have repeatedly applied these standards in this Circuit. *Harris v. Flota Mercante Grancolombiana, S.A.*, 730 F.2d 296, 298–99 (5th Cir.1984); *Stass v. American Commercial Lines, Inc.*, 720 F.2d 879, 882 (5th

Cir.1983); *Helaire v. Mobil Oil Co.*, 709 F.2d 1031, 1036 (5th Cir.1983); *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1247 (5th Cir.1982); *Lemon v. Bank Lines, Ltd.*, 656 F.2d 110, 115 (5th Cir.1981). The district court was therefore correct in concluding that Bay Drilling owed a duty to Theriot to provide a safe work space at the outset in such a condition that an experienced stevedore with the exercise of reasonable care would be able to carry on its operations with reasonable safety. The court below found that Bay Drilling was at fault for failing to clean the deck prior to Theriot's nippling operations. We uphold this finding of negligence as not clearly erroneous.[6]

We conclude that the district court was correct in finding Bay Drilling negligent for an additional reason. The court specifically found that Bay Drilling continued to control the work area, retaining the obligation to clean the keyway deck. We have stated that "the owner has a duty to avoid exposing longshoremen to harm 'from hazards under the act or control of the vessel.'" *Helaire v. Mobil Oil Co.*, 709 F.2d at 1036 (citing *Scindia*, 451 U.S. at 167, 101 S.Ct. at 1622). In fact, *Turner v. Costa Line Cargo Services, Inc.*, 744 F.2d 505, 508–09 (5th Cir.1984), held that a shipowner was liable for injuries sustained by a longshoreman who slipped and fell on an oil slick which was in an area within the shipowner's control. *See also Walker v. Blacksea S.S. Co.*, 637 F.2d 287, 292–93 (5th Cir.1981). The longshoreman's foreman in *Turner* had specifically requested the shipowner to eliminate the dangerous condition. Although Theriot did not request any remedial action, this omission is not fatal. Precedent has not required the longshoreman or stevedore to request remedial action in order to recover from the shipowner for injuries due to a dangerous

6. In maritime cases, the question of negligence is treated as a factual issue which cannot be disturbed on appeal unless the resolution is clearly erroneous. *Valley Towing Service, Inc. v. S/S American Wheat, Freighters, Inc.*, 618 F.2d 341, 346 (5th Cir.1980). We also uphold

the lower court's findings that Bay Drilling knew or should have known that mud was on the keyway deck and that Theriot would traverse the deck to perform his work as not clearly erroneous.

condition within the shipowner's control. *See, e.g., Walker,* 637 F.2d at 288.

■ Bay Drilling further asserts that under *Pluyer v. Mitsui O.S.K. Lines, Ltd.,* 664 F.2d 1243 (5th Cir.1982), the open and obvious nature of the mud on the keyway deck should preclude liability where the condition was not due to Bay Drilling's active negligence. Bay Drilling contends that without a showing that Theriot had to "face the danger notwithstanding the knowledge," it cannot be held liable because the danger was open and obvious. We disagree. The *Pluyer* court found that where a shipowner was actively negligent in furnishing a dangerous ladder to a longshoreman at the outset of his operations, the shipowner was liable for the longshoreman's personal injuries resulting from the open and obvious danger where the danger must be faced notwithstanding the knowledge. *Pluyer,* 664 F.2d at 1243. Although the instant case involves passive, not active, negligence, since *Pluyer* we have held that

> under the "new regime" of [*Scindia*] ... the shipowner has no defense that the hazard was so "open and obvious" to the longshoreman that he either was contributorily negligent or assumed the risk of the hazard by continuing work. This is so because when faced with an openly dangerous shipboard condition, the longshoreman's "only alternatives would be to leave his job or face trouble for delaying the work." In short, "a longshoreman's own knowledge of a shipboard hazard will not negate a shipowner's duty of care which would exist otherwise."

*Stass v. American Commercial Lines, Inc.,* 720 F.2d 879, 882 (5th Cir.1983) (citations omitted). *See also Harris v. Flota Mercante Grancolombiana, S.A.,* 730 F.2d at 299. The trial court's finding that Theriot should have known of the likelihood that mud would be on the deck is therefore insufficient to bar Theriot's claim.

■ Theriot complains that the district court held him contributorily negligent, and that this holding was erroneous because as a matter of law a marine worker cannot be held contributorily negligent. Theriot also contends that the district court incorrectly relied upon the assumption of the risk doctrine which is not available in a § 905(b) LHWCA case.[7] Theriot, however, mischaracterizes the lower court's decision. The district court found that Theriot "should have known of the likelihood that mud would be on the deck" and apportioned 50% of the fault to Theriot. The district court's apportionment of fault was simply comparative fault and not contributory negligence or assumption of the risk which were specifically rejected by Congress in passing the 1972 amendments to the LHWCA. *See Walker,* 637 F.2d at 292. Theriot's citation of *Lemon v. Bank Lines, Ltd.,* 656 F.2d 110 (5th Cir.1981), is similarly not on point. The *Lemon* court concluded that the ability to recover cannot turn upon the stevedore's awareness and control. *Lemon* did not, however, preclude comparative fault. This court has repeatedly affirmed recoveries which apportion fault. *See, e.g., Pluyer,* 664 F.2d at 1245; *Walker,* 637 F.2d at 288; *Valley Towing,* 618 F.2d at 346.

■ Theriot lastly asserts that the record does not provide a reasonable basis for the court's conclusion that he "should have known of the likelihood that mud would be on the deck." After careful review, however, we conclude that the record supports the finding of Theriot's constructive knowledge in light of Theriot's nippling experience with 150 other rigs, the testimony of Theriot's assistant that they sometimes worked in mud, and the Bay Drilling tool pusher's testimony that mud in the area was routine.

## IV. DAMAGES.

■ Theriot appeals the damages award as inadequate and against the great weight of the evidence. We are again on review bound by the clearly erroneous

---

7. Although the complaint does not specifically allege negligence under § 905(b) of the LHWCA, Theriot's case against Bay Drilling was tried on this theory.

standard. *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). Theriot's foremost complaint is that the trial court erred in finding that the March 1981 accident was not caused by the January 1980 ROME injury. Theriot contends that the court's conclusion that the March 11, 1981, accident occurred when Theriot slipped on a bolt, and not when his knee "gave way" as a result of the ROME accident, is erroneous in light of the evidence. Rule 52(a) of the Federal Rules of Civil Procedure mandates, however, that "due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." A review of the record reveals that the evidence as to why Theriot fell on March 11, 1981, was conflicting. Thus we conclude that the trial court's finding that Theriot slipped on a bolt is not clearly erroneous given the trial court's ability to assess the credibility of the witnesses.

■■■■■ Theriot also claims that the district court erred in finding that the March 1981 accident, and not the January 1980 ROME accident, led to the injury necessitating the patellectomy and the resultant increase in disability. Although there is testimony to support Theriot's position that the March 1981 accident merely aggravated the pre-existing condition resulting from the ROME accident, we note that the trial judge chose to discredit this testimony for various reasons, including the inconsistency of one doctor's testimony and the improper basis underlying the testimony of a second doctor. Dr. Leonard testified that the March 1981 accident was the operative cause of the injury necessitating Theriot's patellectomy.[8] The district court's reliance on this testimony was not clearly erroneous.

■■■ Theriot further argues that the district court erred in its causation standard with regard to Theriot's burden of proof. This argument is unpersuasive. The court below correctly applied a standard which required the plaintiff to prove that the ROME accident proximately caused the ultimate condition leading to Theriot's patellectomy. *See United States v. Arrow Stevedoring Co.*, 175 F.2d 329, 331 (9th Cir.), *cert. denied*, 338 U.S. 904, 70 S.Ct. 307, 94 L.Ed. 557 (1949) (following a sole proximate cause standard). Based on its belief in Dr. Leonard's testimony that the March 1981 accident was the operative cause of the injury requiring the patellectomy, the court was justified in its conclusion that Theriot failed to meet his burden of proof.

■■■ Theriot complains generally that the award of damages is inadequate, contrary to the great preponderance of the credible evidence presented at trial. We uphold as not clearly erroneous the district court's factual finding that the January 1980 accident led to a 15% permanent partial disability of Theriot's right leg. Theriot contends, however, that the award is inadequate even on the basis of the 15% disability because it fails to include future wages lost due to Theriot's inability to return to heavy labor work. The court below refused to award future lost wages because Theriot "was discharged to return to work for his former employer in much the same capacity as before the accident." We find no error in this fact finding. As seen in the record, Theriot did return to work in October 1980, and worked until his March 1981 accident. The district court's finding of no loss in future wages is thus not clearly erroneous.[9]

8. Theriot also complains that the trial court erred in restricting the cross-examination of Dr. Leonard by refusing to allow the doctor to answer questions which did not assume the fact of the March 1981 accident.

It is a well-established rule that hypothetical questions posed to experts without personal knowledge must assume a fair, undistorted collection of facts. If the trial judge determined that the omission of an assumption of the March 1981 accident created a distorted collection of facts, it was within his discretion to refuse to allow Dr. Leonard to answer such questions. Thus, we find no abuse of discretion.

9. Theriot argues that the lower court erred in failing to award damages for 15% disability to Theriot's *left* knee (as opposed to damages for his right knee which the court did award). Theriot complains that the court was erroneous

Finally, Theriot argues that the court erred in failing to award damages for secondary back problems. Trial testimony had indicated that Theriot's right knee injury caused him to walk with a stiff-legged gait which resulted in secondary back problems. The district court opinion does not specifically address the issue. Our review of the record, however, leads us to conclude that the court below included this evidence within its award of past and future pain and suffering as a result of the "injuries" incurred in the ROME accident.[10]

## V. INDEMNITY.

On appeal, Bay Drilling argues that the district court erred in construing the drilling contract and its indemnity provision under state law. We agree. Because the construction of a maritime contract is governed by maritime law, *Lirette v. Popich Bros. Water Transport, Inc.*, 699 F.2d 725, 728 n. 11 (5th Cir.1983); *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge*, 424 F.2d 684, 691 (5th Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970), it is necessary to determine whether the contract between Bay Drilling and Houston Oil is maritime. Whether a particular contract can be characterized as maritime depends on the nature and character of the contract, not on the situs of its performance or execution. *Kossick v. United Fruit Co.*, 365 U.S. 731, 735, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961); *North Pacific S.S. Co. v. Hall Bros. Marine Railway & Shipbuilding Co.*, 249 U.S. 119, 125, 39 S.Ct. 221, 222, 63 L.Ed.

510 (1919). Although the line between maritime and non-maritime contracts is often difficult to draw, the Supreme Court has noted that the true criterion is "the nature of the contract, as to whether it has reference to maritime service or maritime transactions." *Id.* A principal determinant is the relation the contract "bears to the ship.... A contract relating to a ship in its use as such, or to commerce ... is subject to maritime law." 1 Benedict on Admiralty § 183 (7th ed. 1985). Not every contract touching incidentally on a vessel will be maritime: "In order that such [maritime] character should attach, there must be a direct and proximate juridicial link between the contract and the operation of a ship...." *Id.*

We need not here today define the outer reaches of what may or may not be termed a maritime contract, for it is clear to us that the Houston Oil-Bay Drilling contract is maritime. The contract provided that Bay Drilling would furnish the equipment, materials, supplies, and services necessary to the drilling and completion of the well. As Exhibits A and C of the contract reveal, the main piece of equipment to be supplied by Bay Drilling was a vessel, a submersible drilling barge known as "The Drilling Barge Rome." The contract did not merely touch incidentally on a vessel, but directly addressed the use and operation of the "Drilling Barge Rome." Oil and gas drilling on navigable waters aboard a vessel is recognized to be mari-

---

in finding that Theriot's injury of the left knee pre-existed the initial January 1980 ROME accident. Theriot asserts that in fact the left knee injury resulted from a fall down steps in April 1982. Theriot argues that because the court failed to conclude that this April 1982 accident did not result from Theriot's knee "giving way" as a result of the ROME injury, the court should have awarded damages for the left leg. Because the evidence as to the date of the injury to the left leg is conflicting, we refuse to overturn the court's finding of a pre-ROME accident injury as clearly erroneous. However, even if the injury to Theriot's left leg occurred in April 1982, there is no evidence other than mere speculation to support Theriot's contention that the ROME in-

jury caused Theriot's left knee to give way in April 1982.

10. Fidelity argued on appeal that the lower court erroneously awarded it $68,977.22 in compensation benefits and medical expenses paid to or on behalf of Theriot where a pretrial stipulation established that it was entitled to $98,571.47. At oral argument, Fidelity stipulated, however, that if Theriot's award of $82,362.95 were affirmed by this court, its appeal as to its right to $98,571.47 in compensation benefits and medical expenses paid would be moot. Since we are affirming Theriot's damage award, we do not address this issue.

time commerce.[11] *Pippen v. Shell Oil Co.*, 661 F.2d 378, 384 (5th Cir.1981); *Boudreaux v. American Workover, Inc.*, 664 F.2d 463, 466 (5th Cir.1981), *cert. denied*, 459 U.S. 1170, 103 S.Ct. 815, 74 L.Ed.2d 1014 (1983). The contract thus focused upon the use of a vessel in a maritime transaction and is a maritime contract governed by maritime law.

We note also that we have in the past termed contracts such as that between Bay Drilling and Houston Oil to be maritime in nature. In *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981), we invoked maritime law to construe an indemnity clause in a contract under which a company agreed to furnish a casing crew to a submersible drilling barge: "It is established beyond cavil that the [contract] is a maritime contract to which federal law is applicable." *Id.* at 332. In *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge*, a lease operator and drilling contractor, like Houston Oil and Bay

Drilling here, signed a Drilling and Reworking Contract providing that the contractor would use its submersible drilling barge to conduct drilling operations for the operator. The contract contained an indemnity provision. In interpreting the indemnity provision, we noted that "[o]f course, the construction of a maritime contract is governed by federal, not state, law." 424 F.2d at 691. In both these cases, the contracts at issue, like the contract here, were directly and proximately linked to a vessel involved in a maritime activity.[12]

We now apply federal maritime law to construe the indemnity clauses of the drilling contract between Houston Oil and Bay Drilling. The "mutual indemnity" clauses in the Houston Oil-Bay Drilling contract provided:

18.10 Contractor's [Bay Drilling's] Indemnification of Operator [Houston Oil]:

---

**11.** Our view that the production of oil and gas from a vessel in navigable waters is a maritime activity is not affected by the recent Supreme Court case of *Herb's Welding, Inc. v. Gray*, — U.S. ——, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). The Supreme Court did not hold therein that oil and gas production from a vessel can no longer be termed maritime commerce, but held instead that not every worker performing a task in oil and gas production from fixed platforms is engaged in maritime employment for purposes of the 1972 amendments to the LHWCA.

The Court's holding that a welder on a fixed platform in Louisiana waters was not engaged in maritime employment because his work did not relate to the loading or unloading of vessels was clearly predicated on the fact that the welder was working on a fixed platform. As the Court observed, fixed platforms are "not even suggestive of traditional maritime affairs." *Id.*, 105 S.Ct. at 1426 (quoting *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 360–61, 89 S.Ct. 1835, 1839–40, 23 L.Ed.2d 360 (1969)). The Court noted that had the welder been on a vessel (as was Theriot here), he would have enjoyed coverage under the LHWCA. *Herb's Welding*, 105 S.Ct. at 1424 n. 2. Apparently a welder aboard a vessel would be engaged in maritime employment under the LHWCA. *See Director, OWCP v. Perini North River Association*, 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983). In sum, the Court's holding must be read in the context of the opinion, tied as it is to the question of coverage under the LHWCA for non-vessel workers.

**12.** The cases relied upon by the district court to support its invocation of state law do not dictate that state law must be applied to the Houston Oil-Bay Drilling contract. The contract in *Grigsby v. Coastal Marine Service of Texas, Inc.*, 412 F.2d 1011 (5th Cir.1969), *cert. denied*, 396 U.S. 1033, 90 S.Ct. 612, 24 L.Ed.2d 531 (1970), did not address the use of a vessel, but concerned a rental agreement between a company which serviced barges and a company which supplied the equipment used for such servicing. In *Dickerson v. Continental Oil Co.*, 449 F.2d 1209 (5th Cir.1971), *cert. denied*, 405 U.S. 934, 92 S.Ct. 942, 30 L.Ed.2d 809 (1972), the contract did not even relate tangentially to a vessel, but involved drilling activities to take place on a fixed drilling platform. Although *Hicks v. Ocean Drilling and Exploration Co.*, 512 F.2d 817 (5th Cir.1975), *cert. denied*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 639 (1976), invoked state law to interpret a master-service contract supplying a labor crew to a vessel, *Hicks* erroneously relied on *Dickerson*, a fixed platform case, to hold the master-service contract non-maritime. Because we find *Hicks* to be inconsistent with *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981), *Transcontinental Gas Pipeline Corp. v. Mobile Drilling Barge*, 424 F.2d 684 (5th Cir.), *cert. denied*, 400 U.S. 832, 91 S.Ct. 65, 27 L.Ed.2d 64 (1970), and the body of law characterizing contracts as maritime if they have a direct and proximate juridicial link to a vessel, we decline to follow it.

Subject to provisions of Paragraph 18.13 hereof, Contractor [Bay Drilling] agrees to protect, defend, indemnify and save Operator [Houston Oil] and its joint owners harmless from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of Contractor's [Bay Drilling's] employees, Contractor's [Bay Drilling's] subcontractors or their employees, on account of bodily injury, death or damage to property.

18.11 Operator's [Houston Oil's] Indemnification of Contractor [Bay Drilling]: Operator [Houston Oil] agrees to protect, defend, indemnify and save Contractor [Bay Drilling] harmless from and against all claims, demands and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party, arising in connection herewith in favor of Operator's [Houston Oil's] employees, Operator's [Houston Oil's] contractors or their employees, other than those identified in Paragraph 18.-10 above, on account of bodily injury, death or damage to property.

Bay Drilling claims that clause 18.11 requires Houston Oil to indemnify Bay Drilling for Theriot's accident because Theriot was an employee of a subcontractor of Houston Oil. Specifically at issue here is the language wherein the operator, Houston Oil, agreed to indemnify the contractor, Bay Drilling, "without limit and without regard to the cause or causes thereof or the negligence of any party."

 "Long-established general principles of interpreting indemnity agreements require that indemnification for an indemnitee's own negligence be clearly and unequivocally expressed." *Seal Offshore, Inc. v. American Standard, Inc.,* 736 F.2d 1078, 1081 (5th Cir.1984). An indemnity provision should be construed to cover "all losses, damages, or liabilities which reasonably appear to have been within the contemplation of the parties." It should not

be read, however, "to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." *Corbitt v. Diamond M. Drilling Co.,* 654 F.2d at 333. We find that the above quoted language, indemnifying Bay Drilling "without limit and without regard to the cause or causes thereof or the negligence of any party," clearly and unequivocally provided Bay Drilling with indemnification for its own negligence. We note that in a recent case we perceived no ambiguity in a mutual indemnity provision identical to that before us today, but described the provision as providing for indemnification of employees *"regardless of whose fault caused the injury." Blanks v. Murco Drilling Corp.,* 766 F.2d 891, 894 (5th Cir.1985) (emphasis added).

Houston Oil contends that the indemnity clauses in its contract with Bay Drilling are indistinguishable from the indemnity clause we held ambiguous under Texas law in *Chevron Oil Co. v. E.D. Walton Construction Co.,* 517 F.2d 1119 (5th Cir.1975). The clause in *Chevron Oil* required indemnity for all claims "irrespective of negligence." The clause here requires indemnity "without regard" to negligence. Because the only "notable difference" between these clauses is the use of the phrase "without regard to," instead of "irrespective of"—a difference which is insignificant given the fact that the two phrases have equivalent meanings—we should hold the instant clause ambiguous, Houston Oil contends. We do not, however, agree with Houston Oil's characterization of the differences between the *Chevron Oil* clause and the clause before us now. The *Chevron Oil* indemnity clause was found ambiguous because it "[did] not specify to whom the phrase 'irrespective of negligence' refer[red]." *Chevron Oil,* 571 F.2d at 1122. Here the indemnity clause clearly specifies that indemnification will follow "without regard ... to the negligence *of any party* " (emphasis added), language which en-

compasses the negligence of the indemnitee, Bay Drilling. We reverse and remand to the district court for judgment in accordance with this opinion.

For the above reasons, the judgment of the district court is AFFIRMED in part and REVERSED in part and REMANDED.