Hubert DUPRE

v.

**PENROD DRILLING CORPORATION.**

No. 90–2729.

United States District Court,
E.D. Louisiana.

March 23, 1992.

■■■

Harvey Jay Lewis, Richard James Serpe, Lewis & Kullman, New Orleans, La., for Hubert J. Dupre, Jr.

William Byron Schwartz, William Daniel Wellons, Burke & Mayer, New Orleans, La., for Penrod Drilling Co. and Penrod Drilling Corp.

Christopher J. Kosciuk, Law Office of James J. Morse, New Orleans, La., for Travelers Ins. Co.

Hal James Broussard, Susan A. Daigle, Paul B. David, Broussard, David & Daigle, Lafayette, La., for Total Minatome Corp.

## ORDER AND REASONS

ARCENEAUX, District Judge.

Third-party defendant, Total Minatome Corporation ("TMC"), filed a motion for summary judgment seeking contractual indemnity from defendant, Penrod Drilling Corporation ("Penrod"). Penrod filed a timely opposition and a cross-motion for summary judgment seeking contractual indemnity from TMC. Having reviewed the memoranda in support, the oppositions, and the applicable law, the court now rules.

## BACKGROUND

The court finds the following facts to be undisputed. Hubert Dupre filed this action on July 30, 1990, alleging damages from injuries sustained while working as a TMC employee on a fixed stationary platform owned by TMC located in the Gulf of Mexico's Vermilion Block 268. Dupre allegedly injured himself when he slipped on mud discharged from Penrod's jack-up rig onto scaffolding erected on TMC's platform.

TMC, the well's operator, and Penrod, a TMC contractor, had previously entered into a Daywork Drilling Contract on or about November 13, 1989.[1] By way of this contract, Penrod agreed to provide equipment, labor, and perform services for TMC's wells located in Vermilion Block 268 off the Louisiana coast on the outer continental shelf. The equipment to be provided specifically included the Penrod 97, a special purpose offshore jack-up drilling vessel.[2]

The Penrod 97 apparently "jacked up" or elevated on three legs next to the well. This particular drilling vessel has equipment that allows it to "cantilever" over a platform. In the instant case, the vessel, therefore, skidded its derrick over the platform.[3] The drill string utilized by the Penrod 97 then passed directly through a bay area in the platform to drill the well.

Penrod employed the Penrod 97 in these drilling operations pursuant to the Daywork Drilling Contract discussed above. Paragraph 14.9 of the Daywork Drilling Contract states:

> 14.9 Operator's Indemnification of Contractor: Operator agrees to protect, defend, indemnify, and save Contractor, its officers, directors, employees and joint owners harmless from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors or their employees, or Operator's invitees ... on account of bodily injury, death or dam-

---

1. The Daywork Drilling Contract is a form agreement developed by the International Association of Drilling Contractors.

2. Penrod avers, without any opposition from TMC, that the Penrod 97's pedigree includes U.S. Coast Guard documentation and ABS classification as a special purpose mobile jack up drilling vessel.

3. TMC, in its memoranda, apparently contends that the jack-up rig was lowered onto the platform. As the court understands the facts, neither the derrick nor the rig rested on the platform. Such fact, however, does not affect the court's analysis because the derrick remained part of the Penrod 97 at all times and never was affixed to the platform in any manner whatsoever. Consequently, no argument may be made that the derrick was a movable or immovable object under Louisiana law rather than an appurtenance of the vessel.

age to property. If it is judicially determined that the monetary limits of insurance required hereunder or of the indemnities voluntarily and mutually assumed under paragraph 14.9 (which Contractor and Operator hereby agree will be supported either by available liability insurance, under which the insurer has no right of subrogation against the indemnitee, or voluntarily self-insured, in part or whole) exceed the maximum limits permitted under applicable law, it is agreed that said insurance requirements or indemnitees shall automatically be amended to conform to the maximum monetary limits permitted under such law.

This provision would appear to provide Penrod with indemnification for injuries sustained by TMC's employees. In paragraph 18, the contract further provides for Texas law to govern and to interpret its provisions.

Penrod filed a third-party complaint in this action on April 18, 1992, seeking indemnification pursuant to the Daywork Drilling Contract. In its motion for summary judgment, TMC seeks dismissal of Penrod's claims and demands.

TMC argues in support that the allegedly "hybrid" set of facts in this case make maritime law inapplicable to the contract before the court. As such, this party contends that Louisiana law should be applied to void the indemnification agreement. In the alternative, TMC posits that, even if maritime law should be found to apply, then the choice of law provision mandates the application of Texas law. Under Texas law, TMC alleges the indemnification clause to be invalid.

Penrod answers that this contract focused on the use of a drilling vessel and such vessel was essential to the performance of the contract. As a consequence, the contract's provisions must be interpreted under maritime law. Penrod agrees that, if maritime law applies, then Texas law governs the indemnification clause. Penrod, however, argues that, under Texas law, the indemnification clause is valid. The court now turns to the merits of these arguments.

## DISCUSSION

### 1. The *Theriot* Dilemma

■ The first issue presented focuses on whether the agreement in question is a maritime or non-maritime contract. In the court's view, the relevant jurisprudence mandates that this contract be interpreted under maritime law.

The U.S. Court of Appeals for the Fifth Circuit ruled in *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir.1986), that "[w]hether a particular contract can be characterized as maritime depends on the nature and character of the contract, not on the situs of its performance or execution." *Id.* at 538. In so doing, the Fifth Circuit recognized that the line between maritime and non-maritime contracts sometimes becomes difficult to draw. *Id.* Notwithstanding TMC's arguments to the contrary, the instant action, however, fails to present a difficult decision in light of *Theriot* and its progeny.

TMC initially argues that *Theriot* stands for an incorrect proposition of law in light of *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). Because the Fifth Circuit decided *Theriot* after *Herb's Welding, Inc.* and specifically addressed it therein, the court finds this argument to be without merit. Even if *Theriot* does not represent a correct statement of the law, this court is duty-bound to apply Fifth Circuit jurisprudence and cannot disregard such case law unless it has been specifically overruled.

TMC then attempts to distinguish *Theriot* on two grounds. First, this party argues that, because the injury in *Theriot* took place in Louisiana's waters and the present accident occurred on the outer continental shelf, the court may distinguish this case from the Fifth Circuit's holding in *Theriot*. Next, TMC contends that the "hybrid" nature of the facts present here mandate a different result from *Theriot*. TMC bases this contention on the argument that the operations at issue in this case involved a jack-up drilling vessel providing services through a fixed platform and the

subsequent degree of the jack-up rig's permanency.

The court finds TMC's first argument based on the situs of this accident to be unpersuasive. In making this argument, TMC directs the court to the three-part test promulgated in *Union Texas Petroleum Corp. v. PLT Eng'g, Inc.*, 895 F.2d 1043 (5th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990). This test sets forth the following three conditions as significant to whether state law should be applied as surrogate federal law under the Outer Continental Shelf Lands Act ("OCS-LA"), 43 U.S.C. §§ 1331–56: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." Because the court finds that maritime law applies of its own force, this case fails to meet the second condition of *Union Texas Petroleum Corp.* to apply Louisiana law as surrogate federal law.

TMC's second and final argument in attempting to distinguish *Theriot* also fails to persuade the court. In making this argument, TMC focuses the court's attention on the jack-up rig's degree of attachment to the outer continental shelf and the operations being performed. In essence, this party contends that, because the Penrod 97's string passed through the fixed platform to attach itself to the seabed and because this contract centered upon drilling services, Louisiana state law (by way of OCSLA) rather than maritime law should apply.

The court finds this contention interesting and it may sometime in the future furnish an important factor in defining vessel status for Jones Act/general maritime law purposes. But, at this time, the jurisprudence simply does not support TMC's arguments. In *Theriot*, the contract at issue involved drilling services but focused on the use of a vessel to perform these services. 783 F.2d at 538–39. The contract between TMC and Penrod contained similar language to the agreement in *Ther-*

*iot* in that it focused on the equipment necessary to perform daywork drilling. As in *Theriot*, the contract here did not incidentally "touch" on the use of a drilling vessel but directly addressed the use and operation of such a vessel.

TMC, however, further argues that *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir.1988), supports the argument that the TMC/Penrod agreement does not represent a maritime contract. The undersigned judge is well versed in the facts of *Thurmond*. In *Thurmond*, the Fifth Circuit found that the contract focused on the performance of wireline services, a nonmaritime activity, and involvement of vessels incidental to such services. The instant matter must be distinguished in that a vessel is the very heart of the contract at issue without which the performance of such contract could not be accomplished.

TMC's arguments with respect to the involvement of a fixed platform and the degree of attachment simply bear no weight with the court. The joint stipulation establishes that the derrick remained attached to the jack-up vessel at all times. Furthermore, the vessel did not need the fixed platform to perform its operations. Consequently, no argument may be made that this derrick ever lost its characteristic as an appurtenance of such vessel.

■ This court finds the facts in *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083 (5th Cir.1990), *cert. denied*, —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991), to be akin to the circumstances at hand. In *Lewis*, the Fifth Circuit noted that "a contract need not specifically reference a vessel if it is actually 'maritime'." *Id.* at 1086. Special purpose watercraft used in the offshore drilling industry, however, have long been held to be vessels by the Fifth Circuit. *Offshore Co. v. Robison*, 266 F.2d 769, 779 (5th Cir.1959). Moreover, contracts that directly require and focus on the use and operation of such special purpose vessels to perform drilling operations are maritime transactions. *Lewis*, 898 F.2d at 1086; *Theriot*, 783 F.2d at 539. The arguments offered by TMC in attacking the wisdom

and applicability of *Theriot* and its progeny, therefore, fail to persuade the court.

The contract at issue here focused and directly involved the use of a vessel in performing drilling operations. Notwithstanding TMC's arguments, this contract could not have been performed without such vessel. The indemnity agreement contained therein, therefore, must be construed under maritime law.

### 2. Texas Indemnity Law

■ Both TMC and Penrod address the law to be applied in the event that the court finds this contract to be maritime and agree that the Texas choice of law provision should be honored.[4] The parties, however, dispute the validity of the indemnity clause under Texas law.

■ Texas law requires a court to perform a two-step analysis in determining the validity of indemnity agreements. *See* Jeanmarie B. Tade, *Texas Anti–Indemnity Law Update*, Feb. 1990, Tex.B.J. at 107. First, the indemnity provision must satisfy the express negligence test. *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705 (Tex.1987). Then, if the indemnity agreement passes muster with the express negligence test, such provision must meet the exceptions provided in the Texas anti-indemnity statute. *See* Tex.Civ.Prac. & Rem.Code Ann. §§ 127.001–127.008 (Vernon Supp.1992). *See generally* Jeanmarie B. Tade, *The Texas and Louisiana Anti-Indemnity Statutes as Applied to Oil and Gas Industry Offshore Contracts*, 24 Hous.L.Rev. 665 (1987) (providing general overview and comparison of these states' indemnity statutes). Thus, the court now turns to an analysis of the indemnity provisions at issue.

■ TMC's attack on the indemnity provisions under Texas law focuses on whether the accident occurred as a result of an injury "arising in connection with" the TMC/Penrod agreement. While TMC proposes to reserve any defenses available under Texas law, it bases the one defense presented on outdated Texas jurisprudence. The court, in particular, refers to the cases of *Westinghouse Electric Corp. v. Childs–Bellows*, 352 S.W.2d 806 (Tex.Civ.App. 1961), *writ ref'd*, 5 Tex.Sup.Ct.J. 462 (1962), and *Sun Oil Co. v. Renshaw Well Service, Inc.*, 571 S.W.2d 64 (Tex.Civ.App.1978), which both pre-date the *Ethyl Corp.* decision and the adoption of the express negligence test by the Supreme Court of Texas.

The Supreme Court of Texas defined the express negligence test as follows: "The express negligence doctrine provides that parties seeking to indemnify the indemnitee from the consequences of its own negligence must express that intent in specific terms. Under the doctrine of express negligence, the intent of the parties must be specifically stated within the four corners of the contract." *Ethyl Corp.*, 725 S.W.2d at 708. In applying this test to language almost identical to the indemnity provisions at issue, the Texas courts have found that this language meets the express negligence test. *See Dupont v. TXO Prod. Corp.*, 663 F.Supp. 56 (E.D.Tex.1987); *Atlantic Richfield Oil & Gas Co. v. McGuffin*, 773 S.W.2d 711 (Tex.Ct.App.1989); *Maxus Exploration Co. v. Moran Bros., Inc.*, 773 S.W.2d 358 (Tex.Ct.App.1989), *aff'd*, 817 S.W.2d 50 (Tex.1991).[5] This court, there-

---

**4.** The court notes that, in *Stoot v. Fluor Drilling Services, Inc.*, 851 F.2d 1514 (5th Cir.1988), the Fifth Circuit stated:

> In the absence of a choice of law clause, the construction of indemnity provisions in a contract involving maritime obligations is governed by maritime law.... However, under admiralty law, where the parties have included a choice of law clause, that state's law will govern unless the state has no substantial relationship to the parties or the transaction or the state's law conflicts with the fundamental purposes of maritime law.

*Id.* at 1517 (citations omitted); *see Hale v. Co-Mar Offshore Corp.*, 588 F.Supp. 1212, 1215

(W.D.La.1984). Paragraph 18 of the TMC/Penrod contract provides for Texas law to govern. Both TMC and Penrod provide Texas business addresses in the contract. Furthermore, the court finds no conflict between Texas state law and the fundamental purposes of maritime law. Consequently, the court agrees with the parties' joint contention that, if the contract is deemed maritime, then Texas law should govern.

**5.** The provisions in *Maxus Exploration Co.* match verbatim the language contained in the indemnity clause at issue. The Supreme Court of Texas affirmed the appellate court in *Maxus Exploration Co.* but applied Kansas law to find

fore, finds the validity and enforceability of the indemnity clause at issue under the express negligence test to be a relatively simple determination.

■ The court further finds that, even if still valid case law, TMC's reliance on the restrictive interpretation of the "arising in connection with" language found in the *Childs–Bellows* and *Sun Oil Co.* decisions to be inapposite. Nothing contained in more recent Texas jurisprudence indicates that such a restrictive approach should be applied. Moreover, the interpretation of virtually identical language to the clauses at issue under the express negligence test by Texas courts does not support TMC's position. This court simply is unable and unwilling to find that the operations taking place when the plaintiff suffered the alleged injury herein did not "arise in connection with" the TMC/Penrod agreement. At best, the court finds such argument to be specious.

■ The Texas anti-indemnity statute also fails to invalidate the clause at issue because of the insurance provisions contained therein. Section 127.005 of the Texas anti-indemnity statute excepts indemnity clauses from the law's prohibitive grasp where "the parties agree in writing that the indemnity obligation will be supported by liability insurance coverage to be furnished by the indemnitor subject to the limitations specified in Subsection (b) or (c)." Tex.Civ.Prac. & Rem.Code Ann. § 127.005(a) (Vernon Supp.1992). Subsections (b) and (c) further provide:

> (b) With respect to a mutual indemnity obligation, the indemnity obligation is limited to the extent of the coverage and dollar limits of insurance or qualified self-insurance each party as indemnitor has agreed to provide in equal amounts to the other party as indemnitee.

(c) With respect to a unilateral indemnity obligation, the amount of insurance required may not exceed $500,000.

*Id.* §§ 127.005(b), 127.005(c). Because the indemnity clause at issue clearly provides for liability insurance coverage, the court must determine the extent of such coverage.

The court, upon review of the indemnity provisions in question, finds the express indemnification obligations assumed to be mutual. Under the Texas statute, the legislature defined a "mutual indemnity obligation" as

> an agreement ... in which the parties agree to indemnify each other and each other's contractors and their employees against loss, liability, or damages arising in connection with bodily injury, death, and damage to property of the respective employees, contractors or their employees, and invitees of each party arising out of or resulting from the performance of the agreement.

*Id.* § 127.001(3). The indemnity clauses here track this language and, furthermore, establish mutual insurance obligations up to the limits permitted under applicable law.

Penrod confusingly informs the court that amendments effective on September 13, 1989, to the Texas indemnity law create a limit of $500,000 for insurance. The 1989 amendments, however, also added section 127.005(b), which clearly allows mutual indemnity agreements to exceed $500,000 but limits the indemnification to equal amounts agreed upon by the parties. At this time, the court, therefore, must find that, because the parties entered this contract on November 13, 1989 (after the effective date of the 1989 amendments), the mutual indemnity due to Penrod is limited only by the equal amounts agreed upon.

The court, in conclusion, finds that the indemnity provision at issue meets the req-

the indemnity agreement therein to be valid. 817 S.W.2d at 57–58. In dictum, the Texas high court indicated that these indemnity clauses satisfied both the express negligence test and the Texas indemnity statute. *Id.* at 56. The Court of Appeals of Texas, Dallas, further found the indemnity provision contained in the daywork

drilling contract to be valid under Texas indemnity law and to satisfy the express negligence test as well. 773 S.W.2d at 361–63. Notwithstanding TMC's semantic arguments, this court is hard-pressed to find the indemnity provisions at issue even arguably to be void under Texas law and/or inapplicable to the facts at hand.

uisites of Texas law to be valid and enforced. This provision passes the express negligence test and satisfies an exception to the Texas anti-indemnity law. Finally, the record does not support TMC's arguments with respect to the accident in question not arising in connection with Penrod's obligation to provide a vessel for drilling operations.

## CONCLUSION

No material facts in dispute exist to preclude summary judgment. The record clearly establishes that the contract at issue focused on a vessel and, thereby, involved a maritime transaction and maritime commerce. Under maritime law, the court must give effect to a valid choice of law provision. In this case, the Texas law applied to this indemnity provision supports its validity and enforceability. For the reasons herein, the motion filed by Total Minatome Corporation for summary judgment is hereby DENIED. The cross motion for summary judgment filed by Penrod Drilling Corporation is hereby GRANTED. Under Texas law, TMC must indemnify Penrod for the equal amounts of insurance obtained by the parties upon execution of the contract at issue and required by the mutual indemnity agreements therein.

IT IS SO ORDERED.