Beverly Locks LEWIS, Individually and as the Tutrix of Her Minor Children, Nona Aisha Lewis, Erisa Kironda Lewis, Jamal William Lewis, Benita Leshawn Lewis and Jeriel Nicole Lewis, Plaintiff,

v.

GLENDEL DRILLING COMPANY and Pioneer Production Corporation, Defendants.

AVANTI SERVICES, INC., Defendant, Third Party Defendant, Cross–Defendant, Appellant,

v.

GLENDEL DRILLING COMPANY and Highlands Insurance Company, Defendants, Cross–Plaintiffs, Appellees,

Mesa (as Successors to Pioneer Production), Third Party Plaintiff, Cross–Defendant, Appellee.

No. 88–4934.

United States Court of Appeals, Fifth Circuit.

April 26, 1990.

---

Robert A. Redwine, Sessions, Fishman, Boisfontaine, Nathan, Winn, Butler & Barkley, New Orleans, La., for Avanti Services, Inc.

Douglas W. Truxillo, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, Lafayette, La., for Glendel Drilling Co.

Patrick W. Gray, Lafayette, La., for Mesa Operating Ltd. Partners.

Before GEE and JONES, Circuit Judges, and HUNTER[1], District Judge.

EDITH H. JONES, Circuit Judge:

This case confronts us again with the vexing question whether liabilities arising from offshore mineral exploration are to be determined under federal admiralty or state law. The result here is foreordained by precedent, but because of an apparently contradictory line of cases in our circuit and the uncertain policy underpinning our result, the appellant would justly ask "why?". Perhaps this court should seek to answer Avanti's question *en banc*.

## I.

### FACTS

Avanti Services, Inc., appellant, signed a turnkey contract with Pioneer Production Corporation (now Mesa Operating Ltd. Partners) to drill a well in Vermillion Block 55 in the territorial waters of Louisiana. Avanti hired Glendel Drilling to furnish a barge rig. The two contracts contain indemnity clauses designed to protect, respectively, Pioneer and Glendel from liability arising out of injuries to employees or invitees of Avanti on the drilling site.[2] Ex-

---

**1.** Senior District Judge of the Western District of Louisiana sitting by designation.

**2.** Pioneer–Avanti contract:

11.3 Contractor [Avanti] agrees to protect, defend, indemnify, and save Operator [Pioneer], its joint owners' and their respective officers, directors, and employees harmless from and against all claims, and causes of action of every kind and character, without limit and without regard to the cause or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Contractor's employees or Contractor's subcontractors or their employees, on account of bodily injury, death, or damage to property. Avanti–Glendel contract:

cept for references to the furnishing of tugs or crewboats in a checklist of equipment needed for the drilling, neither contract mentions a vessel or any maritime condition as bearing upon the work to be performed. Given the location of drilling, however, the use of an offshore drilling rig was obviously necessary. The contracts are in large part form documents used in onshore and offshore mineral exploration.

During the drilling, Avanti hired Schlumberger Well Services to log the well's progress. On April 16, 1985, Schlumberger's crew was on the rig either engaged in or just having completed this task when it was discovered that Ernest Lewis, an employee of Schlumberger, had drowned. He had apparently been trying to transfer to the pipe barge, and thence to Schlumberger's equipment barge, which were moored next to Glendel Rig 18.

Lewis's widow filed suit alleging general maritime claims against Pioneer, Glendel, and Avanti and a Jones Act claim against Schlumberger. The liability actions eventually settled, leaving for resolution the cross-claims for contractual indemnity filed by Pioneer and Glendel against Avanti.[3] The court initially granted Pioneer's and Glendel's motions for summary judgment granting indemnity under maritime law, but upon Avanti's request, it decided to hold a hearing and reconsider.

Avanti alleged that a fact issue existed concerning whether Schlumberger was its invitee at the time of the accident. Avanti had stitched together a circumstantial case suggesting that after Schlumberger finished its work for Avanti on April 16, it commenced an entirely different logging

operation that must have been ordered by the lease operator Pioneer. If the accident occurred during the later, hypothetical engagement, Avanti contended, Schlumberger and Lewis, its employee, had become Pioneer's invitees and the indemnity tables were turned, because Avanti was owed indemnity by Pioneer for injury to Pioneer's invitees. The court, after a hearing and receiving further evidence and briefs, rejected Avanti's argument and entered judgment calling for Avanti to indemnify Pioneer and Glendel according to their settlements with Plaintiffs.[4]

On appeal, Avanti continues to urge that summary judgment was erroneously ordered on the invitee issue. More important, however, Avanti questions the applicability of maritime law to its contractual indemnity obligations. We shall discuss these issues in inverse order.

## II.

### CONTRACTS FOR OFFSHORE OIL DRILLING AS MARITIME CONTRACTS

Avanti contends that its contracts with Pioneer to drill the wildcat well in Louisiana territorial waters and with Glendel to furnish its barge rig for that purpose are not maritime contracts.[5] The essence of a maritime contract, Avanti urges, is a connection with a vessel, but the instant contracts do not refer to a vessel. In a broader sense, Avanti urges that there is nothing inherently maritime in the business of offshore mineral exploration and that state law is better suited to resolve the problems

14.9 Operator's indemnification of Contractor. Operator [Avanti] agrees to protect, defend, indemnify, and save Contractor [Glendel], its officers, directors, employees and joint owners harmless from and against all claims, demands, and causes of action of every kind and character, without limit and without regard to the causes or causes thereof or the negligence of any party or parties, arising in connection herewith in favor of Operator's employees or Operator's contractors or their employees, or Operator's invitees, other than those parties identified in paragraph 14.8 on account of bodily injury, death or damage to property. . . ."

3. Avanti's contracts with Schlumberger and Glendel did not permit indemnity of Avanti for loss attributable to Avanti's payments of contractual indemnity. *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981).

4. No other issues relating to the indemnity obligations are before us.

5. If Louisiana law governs Avanti's contracts with Pioneer and Glendel, Avanti would not be liable for contractual indemnity by operation of Louisiana's Oil Field Anti–Indemnity Act, La. Rev.Stat.Ann. § 9:2780 (West.Supp.1989).

it poses. Finally, because the contract which led to the death of Ernest Lewis was for the performance of wireline services by Schlumberger, Avanti contends that we are bound by our past recognition that wireline services performed offshore do not constitute maritime activity. *Thurmond v. Delta Well Surveyors*, 836 F.2d 952 (5th Cir. 1988).

The relevant law of our circuit does not support Avanti's argument. Since at least as early as 1970, our authorities have identified contracts for offshore drilling and mineral operations involving the use of a "vessel" as maritime in nature. *Theriot v. Bay Drilling Corp.*, 783 F.2d 527 (5th Cir.1986) (contract for use of "the drilling barge Rome"); *Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329 (5th Cir.1981) (contract for casing services to be performed on an inland drilling barge); *Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge "Mr. Charlie"*, 424 F2d 684, 691 (5th Cir.1970) (as to contract for offshore drilling and reworking operations, the court said "of course, the construction of a maritime contract is governed by federal, not state, law." [citations omitted]). Likewise, each of these cases interpreted an indemnity clause in the particular drilling or offshore servicing contract. As Avanti concedes, a contract need not specifically reference a vessel if it is actually "maritime". The drilling contract in *Theriot, supra,* provided that the drilling company "would furnish the equipment, materials, supplies, and services necessary to the drilling and completion of the well." 783 F.2d at 538. These terms are substantially similar to the terms of the contract between Avanti and Pioneer. The court's conclusion in *Theriot* that the contract "focused upon the use of a vessel", *i.e.* the drilling barge identified in an exhibit to the contract, inescapably leads to the same conclusion in this case.

A recent decision of this court questions whether *Theriot's* broad characterization of maritime contracts comports with the Supreme Court's decision in *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). *See Union* *Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043 (5th Cir.1990). Judge Brown's opinion in *Union Texas* goes on to

> construe *Theriot* narrowly and constrain it to its facts. Since no drilling on navigable waters from a vessel is involved here, *Theriot* is not controlling.

*Union Texas*, at 1049. "Constrained to its facts," however, *Theriot* still controls the result in this case. Avanti's reliance on *Union Texas* must be limited to a plea for en banc review of the *Theriot* line of cases.

Only one case arguably runs counter to this authority. Avanti relies heavily on *Thurmond* for the proposition that a contract to furnish wireline services is "clearly a non-maritime obligation" ... "performed on land-based wells and offshore wells, and wireline services present hazards and problems peculiar to the oil and gas industry." 836 F.2d at 955. *Thurmond* applied state law to the construction of an indemnity clause in a wireline service contract, although the contract was performed and the employee injured while working on a wireline barge in Louisiana territorial waters. *Thurmond* is, however, distinguishable precisely because the contract there interpreted called solely for the performance of wireline services by a contractor. Because our other cases hold that contracts to drill a well offshore or to provide general services in connection therewith are, when performed from a movable drilling platform, maritime obligations, we must be bound by those authorities rather than by the special-purpose contract in *Thurmond*.

More difficult to dispose of is Avanti's reliance on the choice-of-law analysis applied by *Thurmond* and *Union Texas*. For although we are bound by cases construing contracts essentially analogous to those in issue here, we recognize the logical conflict between holding that such cases are inherently maritime while a contract for wireline services, not specifically referencing the offshore nature of the work, but actually performed from a barge, is not. Judge Garwood noted the apparent inconsistencies among some of our cases in this area, as well as their failure to cross-cite each

other, in his concurrence to *Thurmond*, 836 F.2d at 957–58.

From these inconsistent lines of authority springs the potential for significant uncertainty in the law applicable to offshore mineral exploration. The application of maritime or state law to a particular contract may turn, as in *Thurmond*, on the degree of specificity with which it identifies operations offshore or on navigable waters. It may turn on whether the particular contractor furnished a "vessel" in connection with his work. It may depend on whether the work is performed from a fixed platform or one of the several types of movable rigs that we have held to be "vessels." By act of Congress, whether the contract covered activity in state territorial waters or on the Outer Continental Shelf will also have an impact on the choice of law. *See* Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(a); *Laredo Offshore Constructors Inc. v. Hunt Oil Company*, 754 F.2d 1223 (5th Cir.1985).

How to resolve these inconsistencies is perplexing. What appears to us as a serious legal conundrum may have had little effect in the real world. That is to say, oil companies, drilling contractors and oil field service companies, together with their insurers, may already have adjusted to the overlapping applications of maritime and state law by choice of law clauses [6] or adjustments in the rates of coverage. We should not lightly "straighten out" the formal logic of the law where to do so would upset stable commercial expectations. Moreover, for purposes of interpreting the reach of federal maritime law, the relative importance that one attaches to the use of "vessels" in offshore oil exploration, the dissimilarity between such exploration and traditional maritime concerns, the impact of potential harm to maritime commerce, and the need for uniformity are matters that have not been settled by the Supreme Court or our court.

This case radiates with the uncertainties that exist in this area of the law. Although it is technically resolved by applica-

tion of settled authority, the persuasiveness of that authority is much in doubt.

There are at least three ways to resolve the inconsistency among our precedents. First, we could hold that no movable offshore oil and gas rig, when moored and engaged in exploration or production, is a vessel. This would apply the realistic view of *Thurmond* and *Sohyde Drilling & Marine Co. v. Coastal States Gas Producing Co.*, 644 F.2d 1132 (5th Cir. 1981) that (a) federal maritime law was not intended to cover liabilities arising from mineral exploration and (b) the adjective use of vessels to assist in such operations is not sufficient to invoke the law of admiralty. This result would also eliminate the rather absurd inconsistency that otherwise exists between applying maritime law to certain mineral exploration contracts when the drilling occurs in state territorial waters, as here, while state law governs precisely the same contractual relationship a few miles further offshore pursuant to the OCSLA. *See Laredo Offshore Constructors, Inc. v. Hunt Oil Company, supra.* As Judge Garwood put it,

> Given the OCSLA directed applicability of state law to such activities when conducted on the outer continental shelf, *see Laredo*, there is plainly much to be said, as Judge Wisdom points out, for also applying state law when the same activities are conducted in the state's territorial waters.

*Thurmond v. Delta Well Surveyors, supra* at 957–58 (Garwood, J., concurring). Despite our reflexive invocation of admiralty jurisdiction to cover contracts involving movable offshore rigs, we have in the OCSLA context recognized that admiralty law is unsuited to dealing with extraction of minerals from the sea bottom. *Laredo*, 754 F.2d 1228 (citing legislative history of OCSLA and *Rodrique v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969)). *See also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 1428, 84 L.Ed.2d 406 (1985) ("[t]here is nothing inherently maritime

---

6. *See, e.g., Angelina Casualty Co. v. Exxon Corp.*, 876 F.2d 40, 42 (5th Cir.1989); *but compare Union Texas, supra*, at 1050 (parties may not

contract away choice of law mandated by Congress through OCSLA).

about" building and maintaining pipes and platforms on the outer continental shelf).

Second, we could retain our decades-old holding that movable offshore rigs are non-traditional "vessels" in admiralty, even when moored in place, while attempting to articulate consistent standards for maritime contracts and liabilities. A variation on the second alternative would be to overrule *Thurmond* and *Union Texas* and apply maritime law to all offshore mineral exploration contracts, save those governed by the OCSLA. Whether one of these results, or others we have not yet conceived, should prevail, we leave to the decision of the court *en banc*.

## III.

### SCHLUMBERGER'S INVITEE STATUS

■ Avanti contended that at the time Ernest Lewis drowned, Schlumberger may have been an invitee of Pioneer rather than itself on Glendel Rig 18, inasmuch as Schlumberger may have been performing services at Pioneer's request. Although Avanti's theory is intriguing, it was not supported by sufficient evidence to raise an issue for summary judgment purposes. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Avanti purported to substantiate its claim with affidavits from two of its employees. One of them stated that the daily drilling log for the well and Schlumberger's invoice for its logging activities both covered a type of logging activity that Avanti had not specifically requested Schlumberger to perform, and it noted that Avanti was not charged for this service. The second Avanti employee stated that he "had no interest" in certain activity that continued on the platform after Schlumberger removed particular equipment from the hole that was needed for Avanti's contract requirements. Neither employee attested that Schlumberger actually performed any additional logging that evening.

In response to this evidence, Glendel submitted affidavits from Mesa (formerly Pioneer) and Schlumberger attesting that Pioneer did not request Schlumberger to perform any logging services of the type contended by Avanti and that Schlumberger did not do any work on the well other than as requested by Avanti. Avanti's evidence does not squarely contradict these affidavits, hence, no genuine issue of material fact appeared over whether Schlumberger was the invitee of Pioneer at the time of the accident.

For the foregoing reasons, the judgment of the trial court is AFFIRMED.