FREEPORT McMoRAN RESOURCE
PARTNERS, LIMITED
PARTNERSHIP

v.

KREMCO, INC.; Dreco Energy Services
Limited, d/b/a Dreco Services; Dreco,
Inc., d/b/a Dreco Services; and National
Union Fire Ins. Co. of Pittsburgh, Pa.

Civ. A. No. 92–0036.

United States District Court,
E.D. Louisiana.

June 25, 1993.

William B. Gibbens, III, Russell Bennett Ramsey, Gelpi, Sullivan, Carroll & Gibbons, New Orleans, LA, for plaintiff.

James J. Hautot, Jr., Michael W. Adley, Juneau, Judice, Hill & Adley, Lafayette, LA, David Arthur Olson, Lemle & Kelleher, David F. Bienvenu, Paul J. Politz, Renee Summer Melchiode, Hoffman, Sutterfield, Ensenat & Bankston, James Richard Holmes, James Holmes, New Orleans, LA, Susan A. Daigle, Bryan David Scofield, Broussard, David & Daigle, Lafayette, LA, John Michael Johnson, Larry Gene Canada, Galloway, Johnson, et al., Donald Richard Abaunza, Russell Keith Jarrett, Liskow & Lewis, New Orleans, LA, for defendants.

## ORDER AND REASONS

LIVAUDAIS, District Judge.

Defendants Underwriters at Lloyd's and Insurance Companies subscribing to Certificate No. 41422 ("underwriters") have filed a Motion for Summary Judgment on the issue of whether claimed damages are excluded from the policy's excess comprehensive general liability coverage. Plaintiff Freeport McMoRan ("McMoRan"), and defendants Kremco, Inc. ("Kremco"), Dreco, Inc. ("Dreco"), and Dreco Energy Services, Ltd. ("DESL"), oppose the motion. The volume of supplemental memoranda filed has led this Court to conclude that it could not be more familiar with the factual intricacies of this case.

## I. Factual and Procedural Background

One of McMoRan's platforms, located in Main Pass Block 299 on the Outer Continental Shelf off the Louisiana coast, sustained structural damage on January 9, 1991. Prior to the accident, McMoRan and Dreco had entered into a contract pursuant to which Dreco was to manufacture three folding derrick drilling rigs.[1] The accident at issue involved one of those rigs. McMoRan planned to use the rig to drill pressure control wells in the Gulf of Mexico. These wells would have relieved the pressure that accumulated as McMoRan drilled into a nearby sulfur dome as part of its sulfur production project.

Dreco's engineering department designed the drilling rig, and then Kremco constructed the rig for Dreco at Kremco's manufacturing plant in Clearfield, Utah. The rig was then shipped to Louisiana, and subsequently transported to McMoRan's platform by a separate contractor whom McMoRan hired. Kremco then affixed the rig to the platform. The derrick portion was designed to be hydraulically raised and lowered, and on January 9, 1991, Kremco employees began to show McMoRan employees how to accomplish this task. In doing so, the derrick was raised to its upright position. Then, as the derrick was lowered, it collapsed and fell into the Gulf of Mexico, damaging McMoRan's platform in the process. The rig's substructure remained on the platform.

McMoRan contracted with Offshore Pipelines, Inc. ("OPI") to retrieve the derrick and other equipment from the Gulf, and to remove the substructure from the platform. OPI charged McMoRan $581,663.15 for these services. The underwriters move for summary judgment here only with regard to the cost of removing the substructure. McMoRan then rented space in McDermott Inc.'s ("McDermott") derrick yard in order to store the derrick while it was repaired. McDermott charged $51,850.63 for these services. After Dreco repaired the rig, McDermott, pursuant to a contract with McMoRan, transported and installed it on McMoRan's platform. McDermott charged $230,822.99 to do so.

---

1. A drilling rig is portable and can be moved from one platform to another. A rig usually consists of several parts: the derrick, the substructure (steel beams and other equipment supporting the derrick), and other machinery.

Shortly after the derrick collapsed, McMoRan hired Waldemar S. Nelson & Co., Inc. ("Waldemar") to investigate why the collapse occurred, and to ensure that a similar fate did not befall Dreco's other two drilling rigs. Waldemar charged $189,986.21 for its services. Third Party Plus ("Third Party") and Wide World Consultants ("Wide World") performed services similar to those of Waldemar, and these companies charged McMoRan $38,925.58 and $2,779.32, respectively.

McMoRan filed suit against Dreco and Kremco alleging breach of contract, negligence, and strict liability. McMoRan also sued Dreco's primary insurer, National Union Fire Insurance Company of Pittsburgh, and Dreco's excess insurer, the Lloyd's underwriters who move for summary judgment here. The underwriters contend that as a matter of law, the policy at issue here (the pertinent language is set forth in the analysis below) excludes from coverage the items of damage specified above. The underwriters further argue that McMoRan's claim for $20,756.93 in attorneys' fees fails.

## II. Analysis

### A. Applicable Law—State or Maritime?

The underwriters contend that the determination of which law applies is irrelevant for summary judgment purposes because Louisiana, Texas, and federal courts have consistently interpreted the language at issue in the excess policy. McMoRan gives cursory treatment to the choice of law issue in its brief, and ultimately concludes, without providing much guidance, that this Court must determine which law applies before deciding the instant motion. The Court agrees with this view.

Notably, the accident occurred on the Outer Continental Shelf, and indeed McMoRan invoked this Court's federal question jurisdiction pursuant to the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331–1356. At first glance, OCSLA seems without question to dictate which law this Court must follow here:

To the extent that they are applicable and not inconsistent with ... Federal laws ... the civil and criminal laws of each adjacent State, now in effect or hereafter adopted, amended, or repealed are hereby declared to be the law of the United States for that portion of the subsoil and seabed of the outer Continental Shelf, and artificial islands and fixed structures erected thereon, which would be within the area of the State if its boundaries were extended seaward to the outer margin of the outer Continental Shelf ...

43 U.S.C. § 1333(a)(2)(A). Assuming that state law applies in this case, OCSLA dictates that the law of Louisiana would govern as it is the state adjacent to the part of the shelf where the McMoRan platform was located. What the parties fail to address in their briefs, however, is whether state law satisfies the "not inconsistent" with Federal law (maritime law in this case) requirement.

The Fifth Circuit has devised a test which somewhat parallels OCSLA's language. In deciding whether Louisiana state law applies as surrogate federal law under OCSLA, courts must examine the following factors: "(1) The controversy must arise on a situs covered by OCSLA (i.e. the subsoil, seabed, or artificial structures permanently or temporarily attached thereto). (2) Federal maritime law must not apply of its own force. (3) The state law must not be inconsistent with Federal law." *Union Texas Petroleum Corp. v. PLT Engineering, Inc.*, 895 F.2d 1043, 1047 (5th Cir.), *cert. denied*, 498 U.S. 848, 111 S.Ct. 136, 112 L.Ed.2d 103 (1990).

The first factor is unquestionably satisfied here; the accident occurred on McMoRan's platform on the Outer Continental Shelf. The second factor, however, presents the troublesome question of whether maritime law or Louisiana state law controls. While the Court ultimately concludes that Louisiana law applies, the facts in this case come perilously close to those in cases where the Fifth Circuit has held that maritime law applies, and therefore a somewhat detailed discussion of choice of law is warranted.

Uncertainty stalks the Fifth Circuit's OCSLA jurisprudence; no less than three sitting judges on that court have recognized the tension in the case law with regard to wheth-

er state law or maritime law applies to certain causes of action arising on the Outer Continental Shelf. "I am ... troubled by the tension, or perhaps outright inconsistency, between many of our opinions in this area." *Thurmond v. Delta Well Surveyors,* 836 F.2d 952, 957 (5th Cir.1988) (Garwood, J., concurring). An "apparently contradictory line of cases" exists with regard to the choice of law issue. *Lewis v. Glendel Drilling Co.,* 898 F.2d 1083, 1084 (5th Cir.1990) (Jones, J.), *cert. denied,* —— U.S. ——, 112 S.Ct. 171, 116 L.Ed.2d 134 (1991). "In each new case, a panel of this court must comb through a bewildering array of cases that rely upon inconsistent reasoning in the hope of finding an identical fact situation. Absent en banc reconciliation, cases thus are decided on what seems to be a random factual basis." *Smith v. Penrod Drilling Corp.,* 960 F.2d 456, 461 (5th Cir.1992) (footnote omitted) (Smith, J.). Unfortunately, the instant case has no preexisting factual twin, and therefore this Court turns to several cases for instructive purposes.

In *Laredo Offshore Constructors, Inc. v. Hunt Oil Co.,* 754 F.2d 1223 (5th Cir.1985), the court held that OCSLA and the relevant state law thereunder applied to a contract for constructing an offshore oil and gas platform that would be permanently attached to the ocean floor on the Outer Continental Shelf. *Id.* at 1229. In reaching this conclusion, the court found persuasive the fact that "Laredo's principal obligation under the contract was the construction of a stationary platform, and ... it is the alleged breach of this obligation that gave rise to the instant action." *Id.* at 1231. The court also noted that while "the contract contemplated the hiring of vessels and seamen to build the structure, [it had] no direct relationship with these traditional subjects of maritime law ... [and] the mere inclusion of maritime obligations in a mixed contract does not, without more, bring nonmaritime obligations within the pale of admiralty law." *Id.*

In the present case, the contract between McMoRan and Dreco specified that Dreco was to design and construct (although Kremco actually performed the construction work for Dreco) three folding derrick drilling rigs for use on McMoRan platforms fixed on the Outer Continental Shelf. Dreco's principal obligation was to manufacture equipment that would be attached to a stationary platform. McMoRan's suit arises out of Dreco's alleged failure to provide a properly constructed derrick. Under *Laredo,* therefore, the McMoRan–Dreco contract is nonmaritime in nature and Louisiana state law governs this case.

The facts in *Union Texas* are also analogous to the facts here. In that case, an offshore construction contract obligated PLT Engineering, Inc. ("PLT") to design, fabricate, and install a pipeline between a platform and another pipeline, all on the Outer Continental Shelf. 895 F.2d at 1045. The Court held that the contract was nonmaritime in nature and that Louisiana state law applied through OCSLA. *Id.* at 1046–47. Maritime law will apply only "in those cases where the subject matter of the controversy bears the type of significant relationship to traditional maritime activities necessary to invoke admiralty jurisdiction." *Laredo,* 754 F.2d at 1231. The *Union Texas* court noted that PLT's principal obligation involved building and installing a pipeline, and that these activities were not traditionally maritime. 895 F.2d at 1049. Therefore, this Court's conclusion that the McMoRan–Dreco contract is nonmaritime in nature also comports with the *Union Texas* decision.

While *Laredo* and *Union Texas* appear to summarily dispose of the choice of law issue, the decisions in three other cases inject some friction into the analysis. The court in *Theriot v. Bay Drilling Corp.,* 783 F.2d 527 (5th Cir.1986), examined a contract which provided for the furnishing of equipment and services necessary to drill and complete an oil well. The court found that maritime law controlled. *Id.* at 538. While the *Theriot* facts are similar to those in the instant case, two considerations support the different result that this Court reaches. First, the *Theriot* contract called for oil drilling. Second, a submersible drilling barge was the main piece of equipment that Bay Drilling was to supply pursuant to the contract. "The contract did not merely touch incidentally on a vessel, but directly addressed the use and

operation of the [vessel]. Oil and gas drilling on navigable waters aboard a vessel is recognized to be maritime commerce." *Id.* at 538–39 (footnote omitted). The terms of the McMoRan–Dreco contract called only for supplying the drilling rig, not for the act of drilling. Furthermore, a vessel was not among the equipment that Dreco was required to supply. Consequently, *Theriot* is inapposite to the instant case.

The court also distinguishes the decisions stemming from contract disputes in *Lewis v. Glendel Drilling Co.*, 898 F.2d 1083 (5th Cir. 1990), and *Smith v. Penrod Drilling Corp.*, 960 F.2d 456 (5th Cir.1992). The *Lewis* court held that maritime law governed two contracts, one that provided for drilling a well, the other for furnishing a barge rig for the project. Neither contract mentioned a vessel nor any maritime condition that might have related to the drilling. *Id.* at 1085. The Court nevertheless found that because the contracts " 'focused upon the use of a vessel' ", they were maritime in nature. *Id.* at 1086 (quoting *Theriot*, 783 F.2d at 539).

The *Smith* court found a drilling agreement to be a maritime contract because it required a party to furnish a jackup drilling vessel to "workover" a well. 960 F.2d at 460. In reaching its decision, the court used the reasoning of the *Lewis* court: The contract focused on the use of a vessel. 960 F.2d at 459–60. While the McMoRan–Dreco contract in the instant case also called for providing equipment that would be used for drilling, it did not involve Dreco providing any sort of a vessel. Although this point might seem a tenuous one on which to reach a different result, the *Lewis* court recognized that whether to apply maritime or state law to a particular contract "may turn on whether the particular contractor furnished a 'vessel' in connection with his work." 898 F.2d at 1087. Because the accident at issue here occurred on McMoRan's platform, and the contract did not require Dreco to furnish a vessel, this Court finds that *Lewis* and *Smith* do not apply.

Finally, the third factor—that state law not be inconsistent with federal law—is satisfied. "[S]tates historically have regulated the practices of all types of insurance companies doing business within their borders and, therefore, state law will apply when construing an insurance policy in the absence of a clear federal precedent to the contrary." *5801 Assoc. Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 665 (5th Cir.1993) (*citing Wilburn Boat Co. v. Fireman's Fund Ins. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955)). No party has presented any, nor is this Court aware of any, clear federal precedent with regard to the "business risk" and "work product" exclusions set forth in the excess policy. Louisiana law therefore is not inconsistent with federal law here. Accordingly, all three factors set forth in *Union Texas* have been satisfied, and Louisiana law governs this case.[2]

## B. Louisiana's Conflict of Laws Jurisprudence

■ Because Louisiana law applies here, the Court looks to Louisiana's conflict of laws principle to determine which state's law the Court should use to interpret the excess policy's exclusions. In analyzing this principle, "the first inquiry is whether there is a true or false conflict of interest." *Peavey Co. v. M/V Anpa*, 971 F.2d 1168, 1171 (5th Cir. 1992); *see also Sandefer Oil & Gas, Inc. v. AIG Oil Rig of Texas, Inc.*, 846 F.2d 319 (5th Cir.1988).

A false conflict exists when only one state has a legitimate interest in the application of its law to resolve the issue. A true conflict exists when each state has such an interest. To determine whether a state has a legitimate interest in requiring that its laws be applied, one must examine whether "the state's relationship to the dispute is within the scope of the state's policy." *Sandefer*, 846 F.2d at 322. If there is a false conflict, one must apply the law of the state with the interest. If there

---

**2.** The Court does not apply the six-factor test set forth in *Davis & Sons, Inc. v. Gulf Oil Corp.*, 919 F.2d 313 (5th Cir.1990). Courts have apparently applied that test to determine if a contract is maritime only in cases involving personal injury. Furthermore, the factors themselves address a personal injury scenario.

is a true conflict ... then one must look to the *Second Restatement. Id.*

*Peavey,* 971 F.2d at 1172 (footnote omitted). This Court now determines which states have a legitimate interest in requiring that their laws be applied.[3]

Dreco, Inc. is a Texas corporation with its principal place of business in Texas, and is licensed to do business in Louisiana. Kremco, Inc. is a Texas corporation with its principal place of business in Utah. McMoRan is a Delaware corporation with its corporate offices in Louisiana, and is licensed to do business in Louisiana. The underwriters are authorized to act as insurers under Louisiana law, but not under Texas law. The four states, therefore, that could possibly have a legitimate interest in this case are Texas, Utah, Delaware, and Louisiana.

The issue here is whether certain claims are excluded from coverage under the excess policy. Certainly, Texas courts have held that "a contractor cannot recover from the insurer for 'his own failure to perform his contract,' but can recover for damage other than to his own work, whether or not that work is defective." *Hartford Cas. Co. v. Cruse,* 938 F.2d 601, 603 (5th Cir.1991) (quoting *Eulich v. Home Indemnity Co.,* 503 S.W.2d 846, 849 (Tex.Civ.App.—Dallas 1973)). However, this determination does not necessarily mean that Texas has an interest in this case. In *Sandefer,* for example, the court found that Texas had no interest in that case because none of the insurance companies which issued the policies in question were domiciled in Texas. 846 F.2d at 323.

This reasoning clearly extends to the instant matter; the certificate issued by the underwriters states that "[t]his insurance contract is with an insurer **not licensed to transact insurance in this State** [Texas] ..." (Certificate of Insurance No. 41422, "Notice to the Named Assured"). While the certificate was issued and delivered pursuant to Texas insurance statutes, Texas has no interest in protecting insurers who are not licensed to do business in that state.

No party has addressed whether Utah and Delaware have legitimate interests in requiring that their state laws be applied in this case. Louisiana has an interest not only because of the myriad cases setting forth its policy regarding the exclusions in question[4], but also because the underwriters are specifically authorized by statute to act as insurers. LSA–R.S. 22:1291–1305. (West Supp.1992). Therefore if Utah and Delaware have no legitimate interest here, a false conflict exists under *Peavey,* and Louisiana law applies. However, because this Court does not have before it the necessary information to determine the interests of Utah and Delaware, it assumes that each has an interest and proceeds to the second inquiry in the conflict of laws analysis.[5]

Pursuant to *Peavey,* the *Restatement (Second) of Conflict of Laws* § 188 (1971), frames the question here. *See also Sandefer,* 846 F.2d at 324. This Court examines the following factors in determining whether Delaware, Utah, or Louisiana law applies:

(a) the place of contracting,

(b) the place of negotiation of the contract,

**3.** The parties raise the possibility that Canadian law might apply because Dreco Energy Services, Ltd., a Canadian corporation, is one of three assureds under the excess policy (Dreco, Inc. and Kremco, Inc. are the other two). *See* Dreco's Memorandum in Opposition, p. 3; Underwriters Motion for Summary Judgment, pp. 1, 8. However, no party has disputed the assertion that Dreco, Inc., and not Dreco Energy Services, Ltd., performed the work that is the subject matter of the excess policy. Consequently, while Dreco Energy Services, Ltd. might be vicariously liable here (an issue this Court does not decide today), Canada has no legitimate interest in seeing that its laws apply to the language of the excess policy.

**4.** *See Lewis v. Easley,* 614 So.2d 780 (La.App. 2d Cir.1993); *Swarts v. Woodlawn, Inc.,* 610 So.2d

888 (La.App. 1st Cir.1992); *Parker v. Dubus Engine Co.,* 563 So.2d 355 (La.App. 3d Cir.1990); *Allen v. Lawton and Moore Builders, Inc.,* 535 So.2d 779 (La.App. 2d Cir.1988); *Gardner v. Lakvold,* 521 So.2d 818 (La.App. 2d Cir.1988); *Breaux v. St. Paul Fire and Marine Ins. Co.,* 345 So.2d 204 (La.App. 3d Cir.1977).

**5.** By assuming that Delaware and Utah each have an interest here, the Court does not taint its analysis. In answering the second inquiry, the Court arrives at the same conclusion that it would have reached had Delaware and Utah had no interest: Louisiana has the most significant relationship with this case and therefore its substantive law governs.

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicile, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Second Restatement,* § 188. The particular issue in this case is whether claims for derrick repair and replacement, repair yard rental fees, engineering consultant fees, and substructure removal are excluded from coverage under the "business risk" or "work product" provisions in the excess policy. With respect to this issue, factors (c) and (d) are the most important, and each of the other three factors are equally less important.

All of the repairs and engineering services, and the substructure removal, were performed in Louisiana or on the Outer Continental Shelf off of the Louisiana coast. The subject matter of the contract—property damage—occurred on the Outer Continental Shelf off of the Louisiana coast. The two most important factors therefore indicate that Louisiana law should control here. With regard to domicile, residence, and place of incorporation, Louisiana has a slightly stronger relationship to the case than Delaware or Utah. McMoRan's corporate offices are in Louisiana, and both McMoRan and Dreco, Inc. are licensed to do business within the state. Delaware's only contact is McMoRan's incorporation there. Kremco's principal place of business in Utah is that state's one contact with this case. Finally, while neither the Court, nor any party for that matter, knows with certainty where the excess policy was negotiated and issued, Texas appears to be the place where these events transpired; the excess policy was issued pursuant to authorization given to Global Special Risks, Inc. of Houston. However, whether the policy was issued in Texas, or in another state, is of minimum importance here. The two most critical factors, and one of the three other factors, under § 188 of the *Second*

*Restatement* lead this Court to conclude that Louisiana insurance law governs this case.

## C. The Excess Policy Exclusions

Rule 56(c) of the Federal Rules of Civil Procedure provides that a court shall "grant summary judgment if there is no genuine issue as to any material fact and if the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Whether the exclusions set forth below operate to bar the disputed claims is a question of law for this Court to now decide. *Lewis v. Easley,* 614 So.2d 780 (La.App.2d Cir.1993). However, with regard to some of the disputed claims, the parties disagree about the facts. With regard to others, the parties merely disagree about the legal conclusion to be drawn from the facts.

The two exclusions in question read as follows:

> This certificate shall not apply:
>
> (c) to claims made against the Assured:
>
> (2) on account of Property Damage to the Assured's products arising out of such products or any part of such products;
>
> (3) on account of Property Damage to work performed by or on behalf of the Assured arising out of work or any portion thereof, or out of materials, parts or equipment furnished in connection therewith; . . .

Subsection c(2) is commonly referred to as the "business risk" exclusion, and subsection c(3) as the "work product" exclusion. The Court now applies the exclusions to the Assured's claims.

### 1. McDermott Charge for Installing and Transporting New Rig—Item No. 152 [6]

■ The parties do not dispute the facts here, although the assureds apparently contradict themselves within their opposition memorandum. *See* footnote 9, *infra.* Dreco replaced the damaged folding derrick with a

---

**6.** The items discussed in this opinion are listed in the Statement of Damages produced by McMoRan. *See* exhibit # 1 to the underwriters' Memo-

randum in Support of Motion for Summary Judgment.

new one, and repaired the substructure. McDermott then transported the replacement rig from its repair yard to McMoRan's platform, and then installed it on the platform. Underwriters claim that under subsection(s) c(2) and/or c(3) of the excess policy, the $230,822.99 which McDermott charged for these services is excluded from coverage.[7]

The court's construction of Louisiana law in *Todd Shipyards Corp. v. Turbine Service, Inc.*, 674 F.2d 401 (5th Cir.), *cert. denied*, 459 U.S. 1036, 103 S.Ct. 447–48, 74 L.Ed.2d 602–03 (1982), is instructive here. The insurance policy which prompted that lawsuit excluded from coverage "property damage to work performed . . . arising out of the work or any part thereof, or out of materials, parts or equipment furnished in connection therewith." *Id.* at 422 (emphasis deleted) (internal quotations omitted). In deciding that this exclusion eliminated coverage for repairing or replacing the insured's work product, the court noted that "courts have consistently held that this language unambiguously excludes coverage for the cost of repairing or replacing non-defective as well as defective components of the insured's work product." *Id.*

The language in the *Todd Shipyards* policy is substantially similar to the language in subsection c(3) of the underwriters excess policy in the instant case. This Court must now decide whether the costs of transporting and installing the replacement rig are excluded from coverage as part of repairing and replacing the assured's work product. While the Court believes that these costs are excluded from coverage under *Todd Shipyards* and other relevant cases [8], the underwriters here have a stronger case than the insurers in any of the cases cited herein. Unlike the

policies in those cases, subsection c(3) of the excess policy here does not simply exclude claims for "property damage to work . . .", but excludes claims "on account of property damage to work . . ." (emphasis added). The Court construes the phrase "on account of" "in accord with its ordinary or natural meaning." *Smith v. United States*, —— U.S. ——, ——, 113 S.Ct. 2050, 2054, 124 L.Ed.2d 138 (1993), *affirming* 957 F.2d 835 (11th Cir. 1992). The words "on account of" mean "because of" here. *See* The American Heritage Dictionary 72 (2d ed. 1982); Webster's New Collegiate Dictionary 8 (5th ed. 1977). Subsection c(3) therefore excludes claims that arise because of property damage to work performed by or on behalf of the assureds. Certainly, the claims for transporting and installing the replacement rig would not have arisen absent damage to the derrick that Dreco designed and Kremco built. These claims therefore fall within the language of c(3).

Make no mistake, however, that this Court does not hold that the underwriters are now free from paying on these claims. Under c(3), the underwriters still must prove that the disputed claims arose out of the assureds' "work or any portion thereof, . . ." Once the assureds' negligence or defective workmanship is established, if it is at all, then subsection c(3) excludes from coverage the McDermott charge labeled Item No. 152. The Court **GRANTS** the underwriters' motion on this specific issue.

McMoRan, Dreco, and Kremco each argue that the charge for transporting and installing the new rig is covered under the excess policy because the assureds' work did not include transporting and installing the original rig.[9] However, the "on account of" lan-

---

**7.** The Court rejects the argument of Dreco, Kremco, and DESL that Endorsement No. 12 of the policy deletes subsection c(3) from the excess policy. No reasonable reading of the endorsement could possibly support that argument.

**8.** *See Lewis v. Easley*, 614 So.2d 780 (La.App. 2d Cir.1993) (Louisiana courts have consistently held that work product provisions—similar to c(3) in the excess policy here—exclude from coverage the cost of repairing or replacing the insured's defective work or product); *Swarts v. Woodlawn, Inc.*, 610 So.2d 888 (La.App. 1st Cir. 1992) (work product exclusion barred coverage

for consequential damages beyond the cost of repairing and replacing the insured's defective work).

**9.** In their opposition memorandum, however, Dreco, Kremco, and DESL apparently contradict themselves by stating that Kremco "rigged up" the drilling rig on McMoRan's platform; this Court is not aware of any substantial difference between "installing" and "rigging up." Assuming *arguendo* that installing or rigging up was not part of the assureds' work, their argument still fails for the reasons set forth above.

guage in the policy subverts this argument and the *Swarts* case implicitly rejects it. In that case, the insured argued that the work product exclusion did not apply to some of the claimed damages because the damages were not the direct result of its work. 610 So.2d at 891. Just as the *Swarts* court dismissed that reasoning, this Court rejects the contention that because the assureds' work did not include transportation and installation, those charges are covered by the excess policy.

### 2. McDermott Charge for Rental of Repair Yard—Item No. 170

The parties dispute the facts surrounding this charge. The underwriters claim that Item No. 170 represents only the charge for renting the McDermott facility to repair and replace the drilling rig. The nonmoving party now has the burden of setting forth specific facts showing that a genuine issue for trial exists. Fed.R.Civ.P. 56(e). The assureds have met that burden. They offer the deposition of Arthur D'Aquin to refute the underwriters' claim that Item No. 170 relates solely to the rental charge. Mr. D'Aquin testified that Item No. 170 also covers "miscellaneous labor and material that might have been associated with dealing with removal of the rig as it came in on the OPI barge and being set in place." (Deposition Tr., p. 70). The Court believes that Mr. D'Aquin's statement is vague, and for that reason, a factual dispute exists as to what services Item No. 170 actually represents. Consequently, the Court cannot decide as a matter of law that the related charges are excluded from coverage, and the underwriters' motion is **DENIED** with regard to this issue.

### 3. Engineering Charges—Item Nos. 10, 13, 18, 59, 73, 99, 102, 104, 106, 125, 130, 153

The parties agree that Waldemar, Third Party, and Wide World investigated the cause of the drilling rig's collapse, that Waldemar and Third Party worked to ensure that the two other manufactured drilling rigs would not collapse, and that Wide World worked to determine whether the damaged rig could function properly. *See* Statement of Uncontested Facts ¶¶ 5–7; Statement of Contested Facts ¶¶ 5–7. The parties also agree that the Third Party charges related to the accident (Item Nos. 13, 18, 59, 73, 99, 104, and 130) total $38,925.58, and that the Wide World charge (Item No. 10) is $2779.32. While the parties initially agreed that the Waldemar charges related to the accident (Item Nos. 102, 106, 125, and 153) total $189,986.21, the response to interrogatories propounded to Waldemar (attached to underwriters' rebuttal memorandum) indicate that the sum is actually $176,354.18. Neither McMoRan nor the assureds have disputed this new figure. Consequently, the Court's decision below applies only to $176,354.18 of the Waldemar charges.

The Court now resolves the legal question of whether the engineering charges are excluded from coverage. In *Swarts,* the court recognized that the work product exclusion—substantially similar to subsection c(3) here—barred recovery for damages "which are not to the work product itself, such as damages for loss of privacy, inconvenience, aggravation, engineering fees, attorney's fees and closing costs." 610 So.2d at 891. In *Allen v. Lawton and Moore Builders, Inc.,* 535 So.2d 779 (La.App.2d Cir.1988), the Court examined a work product exclusion, also similar to c(3). The court held that damages to a house including "the purchase price of $59,000, interest on the purchase price, loss of appreciation, engineering fees, loss of enjoyment of the house, pain and suffering, reasonable attorneys fees, and expert witness fees" were excluded from coverage. *Id.* at 780–82. Finally, the court in *Breaux v. St. Paul Fire and Marine Ins. Co.,* 345 So.2d 204 (La. App.3d Cir.1977), addressed a work product exclusion similar to the one here. The court determined that the exclusion barred coverage of items related to the defective construction of an apartment complex, including "[e]stimated engineering fees to study drainage and flooding problems, make recommendation and designs as to possible remedial and/or rehabilitative work and field crews to do engineering, surveying, and supervising of remedial work." *Id.* at 205 (internal quotations omitted).

Given the broad range of items excluded from coverage in *Swarts, Allen,* and *Breaux,* the fees of Waldemar, Third Party, and Wide World are certainly excluded from coverage when, and if, the assureds' negligence or defective workmanship is established. Consequently, the underwriters motion for summary judgment is **GRANTED** on this issue.

### 4. OPI Charge—Item No. 7

■ The parties agree that McMoRan hired OPI to retrieve the derrick and other equipment from the Gulf of Mexico, and to remove the substructure from McMoRan's platform. Item No. 7 indicates that OPI charged McMoRan $581,663.15 for these services. The underwriters move for summary judgment only with regard to the charge for removing the substructure. The parties agree that the portion of the $581,663.15 attributable to this task remains unclear. This Court must now decide as a matter of law whether the cost of removing the substructure is excluded from coverage. *See Lewis,* 614 So.2d at 782.

Were the substructure removed solely because of damage it sustained as a result of the assureds' negligence or defective workmanship, the cost of removal would be excluded from coverage because the assureds created the substructure. Arthur D'Aquin stated in his affidavit (attached as exhibit "C" to McMoRan's Memorandum in Opposition), however, that OPI removed the substructure because it precluded further use of the platform for drilling relief wells, and thereby diminished the platform's value. The question that now arises is whether economic loss suffered by McMoRan is covered under the excess policy.

While the Court concludes that economic loss does not come within the language of the policy's "Coverage" provision (section I), summary judgment in favor of the underwriters is inappropriate here. An "insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified, by any rider, endorsement or application attached to or made a part of the policy." LSA–R.S. 22:3052.

Initially, the policy excluded liability "for any costs or expenses incurred in or incidental to the raising, removal or destruction of any wreckage and/or debris however caused, whether or not the property of the Assured, and whether or not such raising, removal or destruction is required by law, statute, contract or otherwise." (Exclusion 6). However, Endorsement No. 3 to the policy provides the following: "It is understood and agreed that Exclusion 6., Removal of Wreckage/Debris', of the Excess Liability Exclusions is hereby deleted but only following actual fortuitous physical damage." Considering the policy in its entirety, the Court believes that the parties might have wanted the policy to cover the removal of wreckage and debris, such as the substructure. In applying Louisiana law, this Court must "interpret the policy so as to give effect to the intent of the parties ..." *Heinhuis v. Venture Assoc., Inc.,* 959 F.2d 551, 553 (5th Cir.1992). However, the Court feels that it does not have sufficient information to determine the intent of the parties, and therefore, it cannot determine as a matter of law whether the removal cost is excluded from coverage.

Furthermore, the language of Endorsement No. 3 is vague. Without more information from the parties, this Court is no more equipped to interpret "actual fortuitous physical damage" than is a person selected at random from the New Orleans telephone directory. Consequently, the underwriters' motion for summary judgment is **DENIED** with regard to the OPI charge.

### D. Attorneys' Fees

■ McMoRan has asked for attorneys' fees in this case, and the underwriters now move for summary judgment on this issue. The Court agrees with the underwriters that the law does not provide for the awarding of attorney's fees in either tort or breach of contract actions unless a statute or contract authorizes such an award. Neither the policy in question here, nor any statute of which this Court is aware, authorizes this Court to award attorney's fees in this case. The Court suspects that McMoRan's failure to address this issue in its opposition memoranda indicates that it has come to understand

this. Consequently, the Court **GRANTS** the underwriters' motion for summary judgment with regard to awarding attorneys' fees.

Accordingly,

**IT IS ORDERED** that the underwriters' Motion for Summary Judgment be and is hereby **GRANTED IN PART** and **DENIED IN PART.**